James L. Buchal, OSB #921618
E-mail: jbuchal@mbllp.com
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR 97214
Tel:    503-227-1011
Fax:    503-573-1939
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LUCAS BURWELL; MICHELLE YARBROUGH; KATHERIN KIRKPATRICK; and CHRISTOPHER S. JOHNSON, | No. |
| | **PLAINTIFFS' COMPLAINT** |
| Plaintiffs, | (Civil Rights Violations; 42 U.S.C. § 1983) |
| v. | |
| PORTLAND SCHOOL DISTRICT NO. 1J by and through the PORTLAND SCHOOL BOARD, an Oregon public school entity; and GUADALUPE GUERRERO in his official capacity as Superintendent of Portland School District No. 1J, | |
| Defendants. | |

Plaintiffs Lucas Burwell, Michelle Yarbrough, Katherin Kirkpatrick, and Christopher S. Johnson (collectively, "Plaintiffs") by and through their undersigned counsel, state the following for their complaint:

1.     This complaint challenges the recent and extraordinary policy and practice that has developed at the Portland School District No. 1J of devoting substantial public resources to

promoting and facilitating student protests to support causes favored by outside interest groups and the personal political preferences of the Portland School Board, its administrators, and teachers. An instance of this policy and practice arose through school-system-wide protests in March and April 2018 in favor of gun control, and attacking political opponents of gun control.

2.      The conduct was so extensive that it represents official policy, inflicting an injury for which Portland School District No. 1J is responsible under § 1983. It was orchestrated through the School Board, the Superintendent, and numerous high-ranking administrative officials with final policymaking authority to bind the District, down to individual principals with policymaking authority to bind their schools, all the way down to individual teachers implementing that policy inside and outside of the classrooms.

**Parties, Jurisdiction and Venue**

3.      Plaintiffs Lucas Burwell and Michelle Yarbrough, a married couple, are residents and taxpayers residing in Portland, Oregon, with two children attending Portland School District No. 1J. They bring this action individually, and on behalf of their minor children.

4.      Plaintiffs Katherin Kirkpatrick and Christopher S. Johnson, a married couple, are residents and taxpayers residing in Portland, Oregon, with one child attending Portland School District No. 1J. They bring this action individually, and on behalf of their minor child.

5.      The taxes paid by the parent Plaintiffs, together with other funding from the state and federal government, support the operation of Portland School District No. 1J.

6.      Defendant, Portland School District No. 1J, commonly known as Portland Public Schools or "PPS," is a school district within the State of Oregon and Multnomah County, with authorities and powers as established in ORS Chapter 332, and controlled by the directors of the Portland School Board as provided in ORS 332.005.

7.      With limited exceptions pursuant to ORS 339.030, state law requires Plaintiffs'

children "to regularly attend a public full-time school during the entire school term."  ORS

339.010(1).

8.      Defendant Guadalupe Guerrero is the Superintendent of PPS.  He is sued in his

official capacity only, in order to have an ultimately responsible official to respond to any

injunctive relief the Court may enter.

9.      This action raises questions under the United States Constitution, particularly the

First and Fourteenth Amendments, and 42 U.S.C. § 1983.  This Court has jurisdiction pursuant to

28 U.S.C. §§ 1331, 1343, & 2201-2202, and venue is proper pursuant to 28 U.S.C. § 1391

because defendant resides in the District and the acts described in the Complaint occurred in this

District.

### Common Factual Allegations

**Background Facts:  The Parkland, Florida School Shootings**

10.     On February 14, 2018, student shooter Nikolas Cruz murdered 17 people at

Marjory Stoneman Douglas High School in Parkland, Florida.  Primary responsibility for these

deaths is, of course, Mr. Cruz's, but another contributing factor was an education policy, known

as PROMISE, for Preventing Recidivism through Opportunities, Mentoring, Interventions,

Support and Education, which led school and local law enforcement authorities to excuse Mr.

Cruz from criminal punishment for chronic and escalating criminal conduct prior to the shooting.

11.     Broward County deputies were called to his home 45 times in his middle- and

high-school years.  On one of these occasions, he had punched his mother so hard in the mouth

that he had knocked out three of her teeth.  They and other law enforcement agencies received

multiple warnings of Mr. Cruz's escalating violent behavior and the potential to cause harm to

students at the school.  At school, he had already vandalized a bathroom, causing more than

$1,000 of damage.  He racially abused black students and had fistfights with them.  He carved

swastikas on his desk.  He hurled furniture across classrooms.  He threw hard objects at other

students, sometimes injuring them.  He brought dead animals to school and often waved them

before other students.  He threatened to kill teachers and other students, and to shoot up the

school.  He wrote "KILL" in his notebooks and spoke frequently about guns.  He brought knives

to school and, on one occasion, a backpack full of bullets.[1]

12.     The policy choices of the Broward County school system to decline to hold Mr.

Cruz responsible under criminal law for his extraordinary misconduct proximately caused the

tragedy.  Under existing federal and state laws already restricting the possession and purchase of

firearms, Mr. Cruz would not have been able to buy or possess firearms had Parkland school

officials and Florida and federal law enforcement officers acted properly.  The failure of the

Broward County educational system to respond to the obvious risk posed by the shooter, coupled

with the cowardice of a local law enforcement official, made the Parkland shooting infamous as

perhaps the most preventable mass shooting in American history.

13.     Upon information and belief, PPS follows policies similar to PROMISE.  *The

Oregonian* has reported that Portland Police were called to the school system roughly 5,000

times last year (for a population of only 50,000 students), suggesting a similar failure to punish

prior misconduct promptly, certainly, and with adequate severity, that poses unreasonable risks

to Portland students.[2]

---

[1] These facts are drawn from media accounts including https://www.wsj.com/articles/a-new-sheriff-for-parkland-11549663545; similar facts were circulating as forwarded e-mail information within the PPS system soon after the shooting in February 2018 (*e.g*., Exhibit 1). The official report of the investigating commission confirming most of these facts is publicly available at http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf.

[2] https://www.oregonlive.com/education/2018/12/portland_school_board_votes_to.html

**Background:  The Highly Controversial and Divisive Issue of Gun Control**

14.    The Second Amendment declares:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Second Amendment protects a fundamental civil right to bear arms.

15.    Many Americans believe that the right to keep and bear arms is the most important fundamental right established in the Constitution.  They are concerned about historical examples in which governments have repeatedly used disarmament as a means to subjugate their populations, including atrocities such as Stalin's purges, the killing fields of Cambodia, and the Holocaust, to name but a few, all perpetrated by armed troops against unarmed populations.  In the view of many Americans, the Second Amendment must be protected for circumstances when all other rights have failed.  They believe that governmental action attacking rights under the Second Amendment must be resisted, and that to fail to do so is a mistake that a free people may only get to make once.

16.    Plaintiffs fall into this group, and while some of them may acknowledge that reasonable means may be taken to prevent guns from falling into the hands of bad people, gun control measures that would outlaw ordinary, law-abiding Americans from owning semi-automatic weapons—the policy choice advocated by defendants (*see infra* ¶ 49)—are contrary to the Second Amendment and dangerous to America's survival as a nation of free people.

17.    Other Americans hate and fear guns, believe that ordinary people are unwise and too careless to own guns, and seek to bring about legislative change under which essentially all modern weapons would be left in the hands of professionals on the government payroll.  A very substantial majority of the voters in the political districts comprising Portland School District No. 1J are of this view, including a very substantial majority of the parents with children in the Portland Public Schools.

18.     A substantial portion of this latter group, including those most politically active, is severely prejudiced against the group described in paragraph 15, repeatedly deriding them as stupid or delusional (*e.g.*, "gun nuts").  Within the local communities comprising Portland School District No. 1J, many local businesses put up signs attacking gun owners and the associations they have formed to protect their rights, particularly the National Rifle Association. Local elected politicians also uniformly attack rights under the Second Amendment.

19.     Representatives of defendants are well aware of the political positions of the majority of their parents and believed they would be supportive of organized, large-scale anti-gun demonstrations.  For example, just five days after the Parkland shootings, Heather Hull, principal of Abernethy Elementary, communicated with her representative from the Office of School Performance, Assistant Superintendent Scott Whitbeck that "I have a lot of families that fall into the activist camp and will encourage" (Exhibit 2).

20.     As a result of the foregoing circumstances, plaintiffs and other members of the first group are a political minority in PPS District 1J and have no political remedy against the conduct alleged herein.

**Background:  The PPS Response to Parkland**

21.     The PPS Board began the push to misuse District resources to promote gun control almost immediately after the Parkland shooting.  Two days after the Parkland shootings, Board Member Amy Kohnstamm urged defendant Guerrero to use "our powerful collective voice at this moment on gun control. . . I am talking about lobbying action" (Exhibit 3).  It was at all relevant times the primary motive and goal of PPS personnel to secure political action restricting gun rights, with any concern for educating children entrusted to the care of PPS distinctly secondary.

22.     Within three days of the Parkland shooting, e-mails were circulating widely within PPS, utilizing the official and taxpayer-funded PPS e-mail system, forwarding a call from "actionnetwork.org" declaring that:

> Women's March Youth EMPOWER is calling for students, teachers, school administrators, parents and allies to take part in a#NATIONALSCHOOLWALKOUT for 17 minutes at 10am across every time zone on March 14, 2018 to protest Congress' inaction to do more than tweet thoughts and prayers in response to the gun violence plaguing our schools and neighborhoods. WE.NEED.ACTION. Students and allies are organizing the national school walkout to demand Congress pass legislation to keep us safe from gun violence at our schools, on our streets and in our homes and places of worship. Students and staff have the right to teach and learn in an environment free from the worry of being gunned down in their classrooms or on their way home from school. Parents have the right to send their kids to school in the mornings and see them home alive at the end of the day. We are not safe at school. We are not safe in our cities and towns. Congress must take meaningful action to keep us safe and pass federal gun reform legislation….

(Exhibit 4).

23.     A focal point of organization within PPS was the "Office of School Performance,"[3] which PPS claims was established, among other things, to "coach and provide differentiated support to building leaders to promote culturally responsive instruction, accelerated student learning and student, staff and family engagement."  In fact, it operates as a taxpayer-funded collection of political commissars to promote one-sided political propaganda and exert political control over Portland schools; and its representatives, such as Area Senior Director Karl Logan, acted as early as February 19th to spread the news of proposed national protests on March 14th and April 20th, going so far as to tell PPS Administrators to "text 'Ready' to be connected to fellow 'Mom's [*sic*] demand action for gun sense in America" and advising them to "begin the discussion with our PTA, Site Council, Equity team and student leadership" (Exhibit 5).

---

[3] https://www.pps.net/domain/217

24.     When some school officials promptly objected that staff could not participate in walkouts, Antonio Lopez, Assistant Superintendent for the Office of School Performance, promised, on February 20th, to "send guidelines in the next couple of days" (Exhibit 6) and advised that principals of Portland's schools should be told "we are preparing communication and procedures to follow" (Exhibit 7).

25.     In the meantime, within a week of Parkland, outside anti-gun activists also contacted individual schools seeking to use PPS personnel to identify students who would be willing to "take on the work" of organizing demonstrations.  Individual employees of defendant, such as the Lincoln High School Director of Activities, Hanisi Accetta, stated an eagerness to "partner" with these outside groups (Exhibit 8).  Upon information and belief, multiple anti-gun activists (some of whom were parents with children in PPS schools) stepped forward to assist PPS officials in organizing the anti-gun demonstrations as well.  (*See, e.g.,* Exhibit 9 (2/19/18 offer to "spearhead" event at Abernethy School); Exhibit 10 (2/19/18 inquiry at Beach School); Exhibit 11 (2/19/18 inquiry at Alameda School).)

26.     Upon information and belief, employees of defendants worked actively and utilized taxpayer-funded PPS resources to connect students with outside anti-gun groups.  Upon information and belief, employees of defendants violated the Family Educational Rights and Privacy Act and Oregon law (ORS 336.187) by so doing.  These allegations are pleaded upon information and belief because PPS has refused to provide requested information concerning its employees' involvement in these activities.  Instead, PPS has stonewalled and put up a rigid wall of assertions of student privacy, and assertions that federal law prevents any disclosure of the identity of students, when ordinary citizens, parents, and others not ideologically aligned with PPS employees have sought information about student activities, while providing such

information and access to those groups and individuals which share defendants' anti-gun and other political views and agenda.

27. On February 20th, Suzanne Cohen, president of the Portland Association of Teachers (PAT) publicly announced that "gun control is absolutely an education issue, and it is the most fundamental one…."[4]  The next day, she advised her union members that PAT was already "working with District leadership to plan a safe and supported event on March 14th" (Exhibit 12).

28. This activity was later described by the Superintendent's Chief of Staff as "Guadalupe and Suzanne brainstorming some great ideas to leverage the energy and interest generated by the school shooting into an educational and supportive opportunity" (Exhibit 13). What this language actually meant, and was widely understood to mean, was a political, ideologically-based opportunity to put pressure on elected leaders to support gun control efforts.

29. At all relevant times, it was obvious that PPS, through its Board, Superintendent, and employees, sought to exploit the Parkland shooting by mobilizing demonstrations to advance the cause of gun control.  E-mail circulating within the District reflect a frank admission and recognition by District employees that the purpose of the demonstrations was a political and not an educational one:  "to pressure the government to enact tighter gun control laws" (Exhibit 14). The Oregonian also reported the obvious purpose of the PPS-organized and endorsed events:  "to pressure politicians at the state and national level to enact laws to curb gun violence."[5]

---

[4] https://www.wweek.com/news/city/2018/02/20/this-portland-leader-is-a-parkland-alum-and-ready-to-fight-for-gun-control/

[5] https://www.oregonlive.com/pacific-northwest-news/2018/03/oregon_students_schools_march_14_enough_national_school_walkout.html

30.     Defendants' planning was well-organized, immediate, and effective.  That same day, an 8th grade teacher at Beaumont Middle School reported that:

> I have received word from PAT that the union is working with the district to coordinate a National Walkout on March 14 at 10:00 a.m. to stand with the victims of the Florida shooting on gun control legislation. . .
>
> Roseway Heights, Sellwood, and Grant [Schools] have posted their walkout events through actionnetwork.org, and I am happy to be the point person to post our event. The idea is that all staff and students interested in walking out at exactly 10 a.m. for 17 minutes, can do so. Parents and community members are welcome to participate as well.
>
> This also will also be discussed with staff so that they can prepare students for the day with lessons and activities.

(Exhibit 15).  Upon information and belief, these sort of efforts were already underway at all or nearly all schools operated by PPS.

31.     Defendants also enlisted the local Parent Teacher Associations (PTAs) to support the demonstrations, with the Principal of Beaumont Middle School reporting on February 21st, that she had requested parent volunteers through the PTA to help with the event, and proposing to requisition "one parent volunteer per classroom to participate" (Exhibit 16).

32.     As late as February 23rd, a handful of PPS officials were still proposing restrictive conditions for the demonstrations.  Among other things, high school students participating would receive unexcused absences, and K-5, K-8 and Middle School students would be required to remain in class unless checked out by a guardian (Exhibit 17).

33.     These proposed restrictions were, however, rejected entirely by defendants as interfering with the desired scope of mass demonstrations.  Defendant Guerrero sought guidance from PPS' General Counsel, Liz Large, which upon information and belief related to defendant PPS' desire to relax the restrictions.  He wanted to attempt to ensure that "any action we coordinate or sponsor doesn't get anyone unnecessarily in trouble" (Exhibit 18).

34.     By February 24th, Board Member Rita Moore was also asking the Superintendent to have "district-sponsored activities to capture the energy around the national student walkout on March 24." She called it "a great opportunity to change the prevailing narrative and demonstrate PPS's commitment to student well being" (Exhibit 19) and later told defendant Guerrero that "it would be great if we could capture this energy and work with students on some organized actions" (Exhibit 20).

35.     By February 27th, Board President Julia Brim-Edwards was discussing the need for "a small rep. group of Supt, PAT [Portland Association of Teachers], Board leadership, PAPSA [Portland Association of Public School Administrators] to discuss how we support and what we need to do (board or supt) to support or enable student and staff participation in these events" (Exhibit 21).

36.     By March 1st, defendant Guerrero held a meeting with PPS Principals in which he "shared a brief in-person message with all our principals to signal both the encouragement *and expectation* that they support the appropriate space and activities in response to this recent tragedy" (Exhibit 22 (emphasis added)).  Upon information and belief, all PPS school principals took the Superintendent's directive as a policy-level command to organize demonstrations on March 14th.

37.     Defendant Guerrero followed up the in-person meeting with an official March 5th memo to the Principals, directing them, among other things, to:

> . . . give attention and planning to a visible, school-wide event(s) to begin on March 14th at 10 a.m. This could take many visible forms: students and staff joining hands in a circle on the playground, families joining students for a peaceful walk around the school grounds, or any other activity that you have decided as a community underlines the importance of our schools being safe places.

(Exhibit 23).

**Efforts to Mislead the Public About Defendants' Role**

38.    The memorandum, in an attempt to provide false cover for the unlawful acts of defendants, also included the misleading statement that "we cannot participate in or facilitate a walkout, other than to help ensure student safety."  Defendant Guerrero's public statement to parents, in a District-wide e-mail issued March 6th, was even more misleading, claiming that PPS "policies do not allow us to condone or participate in a walkout," and referring instead to "allow[ing] students to express their views." (Exhibit 24).  These self-serving statements were directly contrary to defendants' actual actions, as defendants were in fact organizing and facilitating the demonstrations, and PPS personnel would later participate in them.

39.    These disingenuous and misleading statements were also made by other, outside parties, working in concert with defendants; for example, on March 7th, PAT reported that:

> In our role as union educators, we cannot legally encourage students to leave campus.  However, in preparing for March 14th, I am sure many of you are already planning to incorporate lessons from U.S. history that illustrate the power of civil disobedience and direct action—especially by young people—in creating lasting social change.
>
> The District is encouraging educators to make it clear to our students that like them, we are grieving and angry about yet another mass school shooting. Everyone is also encouraged to spend time on age-appropriate lessons about what constitutes a safe, supportive classroom, to allow students to express their views, and affirm student engagement on this issue.[6]

40.    In fact, contrary to these self-serving statements, defendants did encourage students to walk out of classes and leave campus.  Through these and similar tactics, defendants and their employees manipulated and encouraged PPS children to take part in the planned demonstrations.

---

[6] http://www.pdxteachers.org/preparing_pps_for_march_14th.

41.     At all relevant times, PPS was attempting to use the students as proxies in this effort and were at great pains to create the false public appearance that the activities were organized and led by students.  From the start, higher level PPS officials, such as Senior Director Karl Logan, internally observed that "the question for us is, 'How can we empower our students to activate their agency in a way that is student lead [*sic*] and in line with PPS policy?'" (Exhibit 5).

42.     A continuous disinformation effort was made by defendants to portray demonstration efforts as student-led.  For example, an Assistant Principal at Laurelhurst School reported on February 27th: "We just got off the phone with our Sr. Director and his guidance was to keep this as student centered as possible."  He suggested that teachers identify useful student proxies so that he and another school official could have lunch with them for event planning, though phrasing his request as "see[ing] what they want to do" (*See* Exhibit 26).  Offering young students who took one side of a controversial political issue private lunches with senior school officials is and was intended to be seductive, to groom, recruit and motivate students to the political cause favored by defendants, in order to reinforce and achieve the political goals of the defendants.  Upon information and belief, no PPS administrator or teacher invited pro-Second-Amendment students to have lunch with them to see what they wanted to do, and PPS offered no school resources to pro-gun students similar to those PPS provided to anti-gun students.

43.     PPS would later extensively publicize the District-wide demonstrations as "students express[ing] their understanding of the Constitution, advocat[ing] for safe schools and common sense gun control, and remind[ing] their peers that their voices are critically important. The students called on us, the adults and the leaders, to take this issue seriously and to commit to

real action."[7]  The motive and goal of defendants was to create through their policy choices widely publicized events which they could falsely portray as primarily the product of student initiative, rather than accurately understood as the product of defendants' political policy choice to organize and promote the demonstrations.  Defendants believed that the false impression that the demonstrations were a student-led activity would most effectively advance their gun control narrative.

### Concrete Organizational Steps

44.    The degree of unlawful facilitation by defendants was ingenious and remarkable. In at least two schools of which plaintiffs are aware, and upon information and belief in all of them, PPS reprogrammed its school bells so that a special protest period could be created, at the expense of ordinary class time, such that no one need be marked absent for participating.

45.    Upon information and belief, teachers throughout the system advised students that they did not need permission from parents to leave classes to participate in the protests.  At Cleveland High School, a statement from the Principal was read to students which told them: "As high school age youth, you do not need to request parent/guardian permission to walk-out" (Exhibit 27).  Defendants have not delivered such messages to students who have wanted to protest in support of conservative positions.

46.    As a result of defendants' politically-motivated, unlawful and irresponsible conduct, students at many schools, including Sunnyside Environmental K-8 School, were later observed to be running wildly and unsupervised in the streets.[8]

---

[7]https://www.pps.net/site/default.aspx?PageType=3&DomainID=92&ModuleInstanceID=1492&PageModuleInstanceID=9806&ViewID=ad4d6d9d-7046-48e7-a548-a6a23a68d076&RenderLoc=0&FlexDataID=124174&PageID=285 ; *see also* https://twitter.com/PPSConnect/status/973965502996361216

47.     Upon information and belief, defendants took the position that unless parents specifically objected to the participation of their children, the student had permission to participate and expected the student to participate.  The PTA at Roseway Heights Middle School advised parents on February 28th:  "IF YOU DO NOT CHOOSE YOUR CHILD TO OPT OUT—YOUR KID WILL BE PARTICIPATING, AS JEREMY HAS BEEN WORKING WITH US TO MAKE THIS A SCHOOL SUPPORTED EVENT!" (Exhibit 28 (emphasis in original)).

48.     Even younger, or developmentally disabled students, incapable of reasoned choice as to participation, were pressed into service as pawns and props by defendants.  One parent complained:  "Our special needs 5th grader doesn't understand why he had to wear a sign around his neck and march around the school…." (Exhibit 29) (Nextdoor posting)).

**Additional Direct Political Activities by Defendants**

49.     Defendant Guerrero began, as early as March 6th, to circulate drafts of an anti-gun resolution for the Board to adopt, working in concert with Board Member Amy Kohnstamm (Exhibit 30).  Even though some of those involved in working on the resolution worried that it would "violate the 'no politics' rule" (Exhibit 31), they nonetheless expanded the resolution from banning the manufacture, sale or possession of so-called "assault" rifles to banning the manufacture, sale and possession of all semi-automatic weapons.  This is a radical political gun ban and confiscation position contrary to settled law and practice; semi-automatic firearms, both rifles and pistols, are among the guns most commonly used by law-abiding Americans for lawful purposes such as hunting, target shooting, organized marksmanship competition, and self-defense.  The PPS Board, with no public comment or notice, no research, and no consideration of opposing viewpoints, adopted a resolution that would turn thousands of parents of PPS students

---

[8] A video of this activity is available at
https://www.youtube.com/watch?v=wxrrnQlkTco&feature=youtu.be

into felons overnight not because they had endangered or harmed or threatened anyone or misused any firearm, but simply by virtue of possession of lawfully purchased firearms which were legal under both federal and Oregon law when acquired. This was blatant politics, not any reasonable effort to protect PPS students or their families.

50.    Board Member Kohnstamm and others also worked to mobilize the participation of local politicians in the effort (Exhibit 30).  Ms. Westling, the Director of Government Relations, organized an entirely one-sided appearance by anti-gun politicians before the School Board to urge the Board to adopt the anti-gun resolution (Exhibit 32).  On March 6, 2018, the Board unanimously adopted the resolution (Exhibit 33).

51.    Politicians, such as Portland Mayor Ted Wheeler, collaborated in the subterfuge that the demonstrations were student-led, issuing a letter to PPS students, which upon information and belief PPS circulated to students, telling students:  "I support you as you make your voices heard" (Exhibit 34).  Anti-gun politicians involved included Gov. Kate Brown, City Commissioner Nick Fish, and State Senator Lew Frederick, who appeared and participated at Roosevelt High School on March 14th.

52.    No pro-Second Amendment politicians, organizations, experts or leaders were contacted or invited by defendants or provided an opportunity to appear.  A Public Records Act production of literally thousands of documents from PPS containing gun-related keywords has turned up essentially no evidence that PPS officials turned to or included pro-gun organizations as sources of information for an alternative view, much less made information from such organizations available to students.  Upon information and belief, when local conservative leaders have sought the opportunity to appear in schools operated by defendant PPS, defendant

PPS has refused to allow their appearances, even when such appearances have been requested by students.

53.     Following the 2018 demonstrations, PPS officials, including defendant Guerrero, continued in active collaboration with political groups and politicians seeking gun ban legislation, involving such PPS officials as Jonathan Garcia, Senior Director, Strategic Partnerships & External Affairs within the Office of the Superintendent, to do so (Exhibit 35). PPS employees continued to utilize PPS facilities for political activities promoting gun control and the banning of lawfully-possessed firearms (*e.g.*, Exhibit 36 (organizing attacks on Oregon Republican legislator)).[9]

### Additional Details Concerning Misinformation and its Misuse.

54.     PPS had developed a team involving the Office of School Performance which included David Northfield, the Director of Media Relations, working on communications for planned anti-gun protests.  On February 21st, Courtney Westling, Director of Governmental Relations, communicated with Mr. Northfield and others concerning a plan to "show our local officials how we execute lock down drills."  Anti-gun activists bragged that "lock down drills can be incredibly traumatic for kids and their teachers.  I want lawmakers to see this, and own this consequence of their lack of action" (Exhibit 37).

55.     One reason the drills are traumatic is because PPS grossly exaggerated risks of gun violence, which is extraordinarily rare, and far behind more common causes of death such as accidental injury, cancer, and congenital anomalies.  For example, posters that were attached to the walls of Irvington Middle School included:

---

[9] *See also* P. Wong, "Wyden to students:  Keep momentum going for 'common-sense' gun regulation," Portland Tribune, Nov. 8, 2018 (available at https://pamplinmedia.com/pt/9-news/411688-312091-wyden-to-students-keep-momentum-going-for-common-sense-gun-regulation) (reporting visit of Senator Wyden to Franklin High School).

 

56.    Such statements exaggerated risks to children by 400 times or more,[10] and contributed to a climate of fear harmful to the well-being of children.  Upon information and belief, defendants caused similar posters to be created in all PPS schools, and displayed prominently in and around the campuses.  Defendants' use of false or misleading propaganda was in furtherance of their political objectives, and not educational.

57.    PPS Schools also created events for students and their families to make these posters (*e.g*., Exhibit 38), and the political indoctrination and messaging focus on legislative gun control issues was remarkably consistent across schools, with students even memorizing and performing identical political chants in schools across the District, such as "Hey ho, Hey ho, the NRA has got to go."  PPS employees exercised control or influence over the messaging, and, upon information and belief, supplied materials such as posterboard that were property of defendant PPS for these events.

58.    The widespread misinformation and one-sided political propaganda presented to Portland students by PPS was obtained by defendants from anti-gun organizations.  Within the

---

[10] An April 20, 2018 study by the *Washington Post* found "143 children, educators and other people" had been killed in school shootings since and including the April 20, 1999 Columbine High School shooting.  (https://www.washingtonpost.com/graphics/2018/local/school-

schools, officials circulated lists of anti-gun organizations as sources of information.  For example, the Wilson High School Counseling Department prepared "Activist Info for Teens" (Exhibit 39).  PPS personnel circulated "March for our Lives resources" to help lead school discussions (Exhibit 40).  Material circulated by PPS included logos, hashtags and symbols from national anti-gun organizations such as "Women's March Youth Empower" (Exhibit 38).  Upon information and belief, no information or resources from pro-gun organizations was circulated to students by defendants.

59.    At all relevant times, to best of plaintiffs' knowledge, none of the information alleged above concerning additional causes of the Parkland shooting, and its wholly preventable nature under current law, was ever included in information presented to PPS students by PPS administrators and teachers.  Instead, PPS presented the consistent and false narrative pushed by anti-gun organizations focusing upon legislative gun control as the exclusive means to assure student safety.

60.    PPS personnel prepared model letters for students urging gun control (Exhibit 41), and upon information and belief, masses of students were mobilized by defendants to generate and transmit these letters to elected leaders.  PPS officials camouflaged the nature of these letters with such subterfuge as advising parents that children were "writ[ing] postcards to our mayor and our governor about what we are doing in Room 107 to treat each other thoughtfully, respectfully, and how we can be safe together" (Exhibit 42).

61.    As just one example, one teacher's detailed account of the political activities in his history classroom claimed that *an entire month* was devoted to lobbying public officials:

> Instead of teaching Louisiana Purchase, Louis and Clark, War of 1812, Oregon Trail, Northwest Native Tribes from the traditional, white male perspective, we flipped the curriculum and taught it from the perspective of the Native Americans.

shootings-database/?noredirect=on&utm_term=.b8c502c13910)

Instead of teaching the history of Portland, Oregon from this same perspective, we taught it utilizing a unit on Vanport.[ ]

We then leveraged the students' new learning of issues of systemic racial and economic inequality into cross-curricular units for Black History month, and a campaign for change to align with the current conversation happening around March for Our Lives and the Gun Control debate.  In conjunction with the classroom teachers, we then designed a month long persuasive writing project where all of the students in third and fourth grades wrote letters to Mayor Ted Wheeler imploring him to take action on issues that mattered to them and their communities.

(Exhibit 43).

### The Pressure to Conform

62.    Advanced techniques used by PPS to emotionally manipulate children entrusted to the care of defendant PPS included widespread use of "community circles to have students talk about school safety and having empathy for students that may be sad or hurt in our world" (*e.g.,* Exhibit 44).  Recommended curriculum, selected without conformance to procedures for public involvement and review, and posted on the website referred to in paragraph 69, suggested activities such as having children read aloud quotes from students from Parkland High School urging gun control, and then engaging in pair and group discussions for "turning despair, grief and anger into action" through "social media campaigns," "traditional media outreach," "walkouts," "lobbying," "getting out the vote," and "boycotts and divestments."[11]  No reference was made to those Parkland students opposed to gun control and concerned about school procedures fostering misconduct, or, indeed, any alternative point of view.

63.    Defendants promoted a focus tending to emphasize emotional responses as part and parcel of their larger political objective to characterize conservative views as threatening the emotional and mental safety of school communities, and thence larger communities.

---

[11]https://www.pps.net/moment, referring to https://www.morningsidecenter.org/teachable-moment/lessons/after-school-shooting-students-take-lead.

64.    Few PPS students could reasonably be expected to stand against the emotional tide of gun control hysteria organized, promoted, fostered and endorsed by defendants through their positions of power and authority in the PPS public schools.  Indeed, a contemporaneous article in the Lincoln High School newspaper on February 26th quoted multiple students as saying that "students and teachers tend to silence the views of conservative and somewhat conservative students" and that "any conservative viewpoint is quickly shot down *and despised*" (Exhibit 45, emphasis added)).

65.    In communications directly to students, PPS employees made it clear to students that participation in the March 14th anti-gun demonstrations was all but required.  For example, the message read to students at Cleveland High School stated:  "Our role, as Cleveland teachers, administrators and staff, is to support you to be safe while expressing your civil rights to make a stand during the national "March for Our Lives" walk out scheduled for 10am on March 14th" (Exhibit 27).

66.    In the wake of the District-wide demonstrations on March 14th, PPS issued a public statement saying:  "Thank you for the demonstration of unity across PPS today."[12]  In other public statements, defendant PPS stated:  "We are proud of our students.  Please know we stand with you.  Your voice is powerful, and you are right to expect action…" for "common sense gun control."[13]  The public emphasis of unity further underscored the degree to which other viewpoints, are, as a practical matter, excluded entirely in PPS by defendants.  By telling protesting students that defendants stand with them, defendants tell students they stand *against* students and others with opposing views, including advocates of Second Amendment rights.

---

[12] https://twitter.com/PPSConnect/status/973995841315782656.

[13] https://katu.com/news/local/pps-reflects-on-student-walkouts-boards-resolution-on-gun-violence-in-schools.

67.     Defendants chilled and suppressed the rights of the pro-Second Amendment students (and indeed any students not sharing defendants' views) to present their own views or dissent from the defendants' anti-gun political activities.  They did this by pressuring students to participate in the demonstrations and forcing any students or parents who had pro-gun views, or who simply believed that children should be in class learning rather than in the streets protesting during school hours, to actively opt out of the demonstrations.

68.     As a result of constant classroom indoctrination and the resulting school atmosphere, those few students who express unpopular beliefs on gun control and other controversial issues—and even those who remain silent—have been subjected to severe bullying, intimidation and ostracism with other students cursing them, attacking them on social media. They have even suffered intimidation from PPS teachers.  Defendants have received complaints from affected parents, and taken no corrective action.

69.     Ultimately, defendants' unlawful, taxpayer-funded indoctrination practices destroy the public discourse making representative government possible, because instead of training children to hear and learn about multiple perspectives on an issue, and debate the merits, PPS trains children to react emotionally based on one-sided propaganda and act out in violation of the rules and norms established by representative government.  The City of Portland is arguably seeing the results of defendants' hyper-politicization of children already as it becomes widely criticized for extreme disorder in public meetings.

### Scope of the Unlawful Effort

70.     The degree of PPS educational resources that were mobilized to organize and support the demonstrations was extraordinary and cannot be overstated.  Hundreds if not thousands of hours of compensated PPS staff time was expended for weeks before the March 14th demonstration and afterwards.  PPS resources were commandeered for such activities as

creating an anti-gun op-ed on February 28th for the Superintendent (*See* Exhibit 46).  An entire special website was created "with lessons, messaging and other resources for educators and families" (Exhibit 47).  The District's media personnel produced professionally edited videos of the activities for media distribution.

71.    Vast amounts of class time were also devoted to the issue, out of any and all proportion to its educational significance.  Even in science classes, teachers led discussions advocating gun control (*See, e.g.*, Exhibit 48).

72.    At all relevant times, messaging focused upon gun control, such as these two protest signs, used at Franklin High School on March 14th:



73.    To estimate the resources involved here, plaintiffs note that the 2018-2019 school budget for PPS calls for the expenditure of $655 million in resources for roughly 175 class days, or roughly $3,743,000/class day.  As a practical matter, at least one entire instructional day was lost on March 14th.  (At Franklin High School, teachers showed students the movie *Kung Fu Panda*, as students, having been emotionally wound up by defendants' propaganda and theater, were allegedly too agitated to engage in ordinary studies.)

74.    In addition to the March 14th demonstrations themselves, scarce school resources were misused by defendants in a massive, systematic and continuous fashion in the weeks leading up to the March 14th demonstration, and for further demonstrations thereafter, including but not limited to those on March 15th and April 20th.  A conservative estimate that only four days' worth of staff and instruction time involved would be associated with a nearly $15 million expenditure, or the equivalent of the average real estate taxes on nearly 6,000 Portland homes (assuming $2,500 annual tax/homeowner).  Defendants' ability to capture such amounts of public resources to fund and promote their political agendas creates powerful incentives for unconstitutional conduct.

75.    Upon information and belief, many parents have responded to the politicization of PPS alleged herein by removing their children and homeschooling them, at significant personal cost, while they continue to be required to pay local school taxes.  Those parents that cannot afford to do so are required to pay and subject their children to defendants' political indoctrination.

76.    Plaintiffs have suffered nominal damages by reason of the past deprivations of their constitutional rights, but are primarily concerned with securing declaratory and/or injunctive relief to ensure that this misuse of public resources is not repeated.

77.    All the acts of defendants, their officers, agents, and employees, were taken and continue to be taken under color of state law.

78.    Defendants knew or should have known that their efforts to organize and subsidize the Demonstrations violated plaintiffs' constitutional and statutory rights, including those under the First and Fourteenth Amendments and 42 U.S.C. ¶ 1983.  Defendants' fostering of what constituted, in substance, mass demonstrations against rights recognized in the Second Amendment was entirely at odds with the statutory direction to defendants that "special

emphasis shall be given to instruction in… obedience to law, respect for the national flag, the Constitution of the United States and the Constitution of the State of Oregon….ced" ORS 336.067(1)(a).  It was also at odds with formal PPS policy 30.40.030-P, which declares: "Students have the right to an education and the Board intends to protect that right in the event of a demonstration or other disorder disruptive to the school environment" (Exhibit 49).

79.     Oregon education regulations further confirm that that "[t]he ethical educator, in fulfilling obligations to the student, will. . . [r]efrain from exploiting professional relationships with any student for personal gain, or in support of persons or issues" OAR 582-020-0035(1)(b). Defendants' organized violations of this regulation constitute evidence of the degree to which their political ideology motivated them to disregard the Constitutional and statutory rights of plaintiffs.

80.     Defendant PPS has a formal policy 3.50.032-AD, "When Demonstrations Occur," which is supposed to govern its conduct, and that of its employees, if confronted with demonstrations led by outside agitators in concert with students.  That policy requires, among other things, that school administrators:

      a.  Notify parents of students leading the demonstration or disorder to come to school at once;
      b.  Prevent entry to the area by other students if possible;
      c.  All teachers should keep students in classrooms and proceed with the usual lesson plans and activities. . . Students may be dismissed only in cases of dire emergency;
      d.  Demonstrators should be advised that their activity is unauthorized, and they should be told by the principal. . . to desist and disperse immediately;
      e.  Students should be given a five-minute warning to cease and desist in the demonstration and notified that failure to comply will result in immediate suspension from school. . .

(Exhibit 50).

81.     Defendants made a political policy choice to violate and not to adhere to this policy with respect to the March 14th demonstrations, and with respect to further demonstrations

occurring on March 15th, and April 20th.  For example, the day before an April 20th

demonstration, which defendants also portrayed as student-led, defendant PPS e-mailed parents

to say that far from opposing the demonstrations, "we support student-driven conversations and

actions"; that "students will not be punished"; and that "principals might ask staff to accompany

students as a safety precaution" (Exhibit 51).

82.    Defendants repeated policy-based determinations to set aside official policy to

promote particular political goals further demonstrates the political motives of defendants.

83.    The 2018 demonstrations were not isolated instances, but part of a pattern that has

also seen publicly-reported demonstrations at PPS on several prior occasions, including large-

scale demonstrations arising out of the election of President Donald Trump.  The 2018

demonstrations are part of a larger pattern of political misuse of public resources mobilizing

students to advance political positions, which has included efforts related to such national issues

as "climate change," "net neutrality" (increased government control over the Internet),[14] and

illegal immigration, as well as local issues like school bond measures.[15]

84.    There is an actual controversy between plaintiffs and defendants concerning the

lawfulness of defendants' conduct mobilizing students for political purposes within the meaning

of 28 U.S.C. § 2201(a).

85.    Further demonstrations are threatened in the future, and plaintiffs have no

adequate remedy at law.  They will suffer continuing and irreparable injury unless and until this

Court enjoins the conduct complained of.

---

[14] https://twitter.com/PPSConnect/status/983407326836092928 (defendant Guerrero, the
Governor, the Attorney General, a state legislator and others celebrate bill signing at Mt. Tabor
Middle School).

[15] https://www.kgw.com/article/news/education/pps-students-stage-walk-out-to-protest-bond-
decision/315141849.

86.     Exhibits 1-11, 13-23, 25-26, and 30-48 are true copies of documents (or excerpts thereof) received through the records request alleged in ¶ 99.  Exhibit 12 is a true copy of a document downloaded from the Portland Association of Teachers website.  Exhibit 24, 27 and 51 are true copies of e-mails issued by PPS to Portland parents.  Exhibit 28 is a true copy of material downloaded from a Facebook page maintained by the Roseway Heights School PTA.  Exhibit 29 is a true copy of a page downloaded from Nextdoor.com.  Exhibits 49 and 50 are highlighted copies of documents downloaded from the PPS website.

## FIRST CLAIM:  VIOLATION OF FIRST AMENDMENT RIGHTS

### Count 1:         Forced Subsidization of Speech

87.     Plaintiff realleges paragraphs 1 through 86 as if set forth herein.

88.     The parent plaintiffs have no choice but to subsidize the operation of PPS through their local taxes.

89.     Defendants made, and continue to threaten to make, plaintiffs and their children instruments for fostering public adherence to views they oppose.

90.     In substance, defendants converted a portion of plaintiffs' local tax payments into forced contributions to political messages they oppose, and threaten to continue to do so.

91.     This political messaging was not primarily speech by the government itself, but the speech of private actors, the students mobilized by defendants to speak in favor of gun control.  Indeed, it was a prime objective of defendants to ensure that the demonstrations be perceived as private speech, so as to maximize public pressure on elected officials to support measures opposed by plaintiffs.

92.     Defendants' compulsory subsidization of ideological activity to which plaintiffs are opposed violated the First Amendment rights of plaintiffs and violated 42 U.S.C. § 1983.  These unlawful activities will continue unless enjoined.

93.     Plaintiffs are entitled to an award of nominal damages, and to their reasonable attorney fees pursuant to 42 U.S.C. § 1988.

**Count 2:     Compelled Speech (Social and Peer Pressure)**

94.     Plaintiff realleges paragraphs 1 through 93 as if set forth herein.

95.     The circumstances leading up to the March 14th demonstration, including emotional consciousness- (and really fear-) raising by teachers, postering campaigns and direct solicitation of student input, combined to create a coercive atmosphere within the schools that put the student plaintiffs under compulsion to participate in the March 14th demonstrations and other anti-gun-related activities, as well as to chill and to suppress the rights of PPS students and their parents who opposed the PPS anti-gun agenda.

96.     Defendants' conduct compelling speech by the student plaintiffs was a violation of their First Amendment rights and violated 42 U.S.C. § 1983.

97.     Plaintiffs are entitled to an award of nominal damages, and to their reasonable attorney fees pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM:  PUBLIC RECORDS ACT (PENDANT STATE CLAIM)**

98.     Plaintiffs reallege paragraphs 1 through 97 as if set forth herein.

99.     Plaintiff Kirkpatrick issued, through counsel, a Public Records Act request to PPS on March 26, 2018 relating to the issues alleged above.   PPS subsequently demanded and received the sum of $8,552 to respond to the request.  Essentially no responsive documents were produced for months, forcing Kirkpatrick to seek an order compelling PPS to comply with the law.

100.    By Order issued September 7, 2018, the Multnomah County District Attorney, exercising his review powers under ORS 192.411 and ORS 192.415, ordered PPS to complete its request by December 6, 2019.

101.    As of the filing of this complaint, PPS has yet to complete its response to the record request, and absent injunctive relief, plaintiffs will continue to suffer irreparable injury because of PPS' refusal to produce the documents.  PPS's stonewalling and refusal to comply with the Public Records Act further reveals and evidences the evasive and improper motives of PPS's actions as alleged herein.

102.    Plaintiff is entitled to an award of attorney fees pursuant to ORS 192.431(3) and other authority.

## Prayer for Relief

WHEREFORE, Plaintiffs pray for the following relief:

1.    On the First Claim, for a declaratory judgment that defendants' conduct in mobilizing Portland schoolchildren for political purposes violated the First Amendment rights of parents and their children, and violated 42 U.S.C. § 1983.

2.    On the First Claim, for a permanent injunction forbidding defendants from:

(a)    Utilizing public resources to promote an anti-gun agenda, including but not limited to (i) permitting PPS employees to utilize PPS communication systems to forward and circulate materials from partisan groups advocating for gun control (or other politically controversial issues); (ii) permitting PPS employees to engage in organization and coordination with groups outside PPS interested in advocating for gun control (or other politically controversial Issues) while working at PPS and utilizing PPS communications systems; (iii) allowing PPS employees to register their PPS e-mail addresses with online anti-gun activist organizations;

(b)    Creating time periods during which students may participate in political protests without being marked absent from class;

      (c)     Enlisting school children to write letters or otherwise lobby public officials in advocating for gun control (or other politically controversial issues) where such efforts are accompanied by presentations, input from outside organizations, or sample communications presenting only one political view;

      (d)     Posting posters, decorations or display that advocate gun control (or other politically controversial issues) to the exclusion of opposing points of view.

      (e)     Extending teaching in advocating for gun control (and other politically controversial issues) beyond government-related classes into non-related subjects such as math and science;

      (f)     Utilizing instructional materials prepared by third-party groups for politically controversial issues that have not been adopted in compliance with Oregon statutory protections of parental rights concerning instructional materials, as set forth in ORS 337.120;

      (g)     Employing political criteria for evaluating access to PPS students by outside groups; and

      (h)     Retaliating against, punishing, bullying, harassing plaintiffs, their children, and/or any students who express pro-Second Amendment positions.

3.     In the alternative to the foregoing relief on the First Claim, ordering defendants to adopt a voucher program through which objecting parents can utilize public resources for the private education of their children that is not at odds with their fundamental political beliefs.

4.     On the First Claim, for an award of nominal damages in an amount to be determined by the Court.

5.     On the Second Claim, for an order compelling PPS to complete its production of all documents in response to the outstanding requests within one week and awarding plaintiff Kirkpatrick her reasonable attorney fees for the costs incurred in securing relief.

DATED:  March 13, 2019.


                    **MURPHY & BUCHAL LLP**


                    *s/ James L. Buchal*
                    James L. Buchal, OSB No. 921618
                    3425 S.E. Yamhill Street, Suite 100
                    Portland, OR  97214
                    Tel:  503-227-1011
                    Fax:  503-573-1939
                    jbuchal@mbllp.com
                    *Attorney for Plaintiffs*