**William F. Gary, OSB #770325**
**william.f.gary@harrang.com**
**J. Aaron Landau, OSB #094135**
**aaron.landau@harrang.com**
HARRANG LONG GARY RUDNICK P.C.
497 Oakway Road, Suite 380
Eugene, OR 97401-3273
Telephone:      541-485-0220
Facsimile:      541-686-6564
Of Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **LUCAS BURWELL, et al.,** | Case No. 3:19-cv-00385-JR |
| Plaintiffs, | **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST CLAIM FOR RELIEF AND MEMORANDUM IN SUPPORT** |
| vs. | |
| **PORTLAND SCHOOL DISTRICT NO. 1J, et al.,** | **Pursuant to Fed.R.Civ.P. 12(b)(6)** |
| Defendants. | **Request For Oral Argument** |

### LR 7-1 CERTIFICATION

In compliance with this Rule, the parties made a good faith effort via telephone conference to resolve the dispute and have been unable to do so.

### MOTION TO DISMISS

Defendants Portland School District No. 1J ("PPS") and Guadalupe Guerrero move to dismiss plaintiffs' First Claim for Relief ("Violation of First Amendment Rights") under Fed. R. Civ. P. 12(b)(6) because plaintiffs fail to allege a claim upon which relief can be granted.

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

**1.    Introduction**

Plaintiffs' First Claim for Relief alleges that defendant PPS and its Superintendent violated their rights to free speech under the First Amendment by taking positions on gun-control issues (and by encouraging students to take positions on those issues) that were contrary to plaintiffs' beliefs.  Plaintiffs' claim is based on two distinct alternative theories.  In the first, plaintiffs allege that defendants created an environment that unconstitutionally "compelled" plaintiffs to speak in ways that were contrary to their views.  In the second, plaintiffs allege that, because plaintiffs pay taxes that help fund education in Oregon, they have been unconstitutionally compelled to subsidize speech that is contrary to their views.  Neither theory states a claim upon which relief can be granted.

Plaintiffs' "compelled speech" theory fails because plaintiffs have not alleged facts showing that they were "compelled" by the government to express a particular view.  Plaintiffs' "compelled subsidization" theory likewise fails, chiefly because what plaintiffs allege that they have been compelled to subsidize is not private speech but the government's own speech—and there exists no First Amendment right not to subsidize government speech.  Moreover, plaintiffs have not alleged facts showing any "subsidization" because any support provided was not monetary; because the use of general tax revenue creates no harm to any particular individual's associational rights; and because even as alleged, the defendants' actions were taken to advance a legitimate government purpose—namely, seeking to increase safety and reduce gun violence in Oregon's public schools—regardless of whether plaintiffs agree with the policies by which defendants sought to further that purpose.

**2.    Standard of Review Governing Defendants' Motion**

Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks "sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  For purposes of a motion to dismiss, the plaintiff's well-pleaded

allegations are taken as true, and the court must construe them in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Although in considering a motion to dismiss the court must accept as true all well-pleaded factual allegations in plaintiffs' complaint, it is "not, however, required to accept as true allegations that contradict exhibits attached to the Complaint," or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F3d 992, 998 (9th Cir. 2010). *See also Iqbal*, 556 U.S. at 679 (allegations that "are no more than conclusions, are not entitled to the assumption of truth"); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–755 (9th Cir.1994) (court need not accept as true "conclusions [that] cannot reasonably be drawn from the facts alleged"). By the same principle, the court need not accept as fact plaintiffs' editorial characterizations of the parties' alleged actions. *See, e.g.*, *Coburn v. Nordeen*, 72 Fed. Appx. 744, 746 (10th Cir. 2003) ("Although plaintiff characterized certain of the defendant's statements in the affidavit as 'false,' … her characterizations are merely conclusory allegations, not well-pled facts which must be accepted as true.").

### 3. Plaintiffs' Allegations

This action is brought by five plaintiffs, four of whom are parents of students who attend public schools in Portland (and who are Oregon taxpayers), and one of whom is a student currently attending a public school in Portland. First Amended Complaint ("FAC") at ¶3-6. As plaintiffs allege, the crux of their complaint is that defendants have expended district resources to "support[] causes favored by outside interest groups and the personal political preferences of the

Portland School Board" and its employees, chiefly by "promoting and facilitating student protests" that favor gun control. *Id.* ¶1.[1]

As to defendants' specific actions, separating the well-pleaded facts that plaintiffs have alleged from their conclusory allegations, unwarranted deductions, and unreasonable inferences is particularly challenging and critically important. Plaintiffs characterize defendants' actions using highly-charged and often alarming language. For instance, they complain of efforts by defendants "to be seductive," to "groom," and to "recruit" students "to the political cause," *id.* ¶43; an "ingenious and remarkable" display of "unlawful facilitation," *id.* ¶45; creation of "a climate of fear harmful to the well-being of children," *id.* ¶57; "political indoctrination," *id.* ¶58, "subterfuge," *id.* ¶61; and "advanced techniques … to emotionally manipulate children," *id.* ¶64, all culminating in "an emotional tide of gun control hysteria organized, promoted, fostered, and endorsed by defendants through their positions of power and authority in the PPS public schools." *Id.* ¶66.

Such hyperbole, while commonplace in internet comment threads, does not constitute well-pleaded facts. In fact, at times, plaintiffs' superheated rhetoric directly contradicts the actual facts that plaintiffs allege. For example, plaintiffs quote from (and attach as an exhibit) an e-mail from the Superintendent's Chief of Staff that described "Guadalupe and Suzanne brainstorming some great ideas to leverage the energy and interest generated by the school shooting into an educational and supportive opportunity." FAC ¶ 29 and Ex. 13. Plaintiffs then state, based on nothing but their own conjecture, that "[w]hat this language actually meant …was a political, ideologically-based opportunity to put pressure on elected leaders to support gun control efforts." *Id.*

---

[1]     Plaintiffs state that their concerns are not limited to the issue of gun control, but also include PPS taking positions on issues including climate change, net neutrality, illegal immigration, and school bond measures. *See* FAC at ¶88. However, plaintiffs' complaint is chiefly focused on the issue of gun control.

Page 4 –     **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST CLAIM FOR RELIEF AND MEMORANDUM IN SUPPORT**

Defendants do not seek to litigate the facts of this case, because that is not the purpose of a motion to dismiss. But in determining the legal sufficiency of plaintiffs' complaint under Rule 12(b), it is only the well-pleaded factual allegations that matter, and not plaintiffs' conclusory allegations and editorial characterizations. *Daniels-Hall*, 629 F.3d at 998.

Setting aside plaintiffs' characterizations, the key allegations of plaintiff's First Amendment claim can be fairly summarized as follows:

- Defendant PPS, through its Board, took positions on several issues related to gun control, a politically controversial topic. It did so, for instance, by adopting a formal Board resolution that in part called on Congress to enact stricter laws concerning firearms. FAC ¶50. Those positions were contrary to plaintiffs' positions on gun control. *Id.* ¶17.

- Defendants used PPS resources to further their goal "to secure political action restricting gun rights[.]" *Id.* ¶22. Defendants permitted PPS employees to engage in organization and coordination with groups outside PPS interested in advocating for gun control, *e.g.*, *id.* ¶24, and permitted them to use the "taxpayer-funded PPS email system" to forward and circulate materials that advocated for gun control. *Id.* ¶23.

- Defendants encouraged students to contact their elected public officials in ways that advocated for gun control, *id.* ¶61, and, as part of that process, PPS employees used materials from outside organizations that supported gun control but not materials that supported "opposing points of view." *Id.* Defendants also posted posters, decorations, or displays that advocated gun control, but did not post similar materials representing "opposing points of view." *Id.* ¶58.

- Through PPS employees, defendants advocated for gun control during class time, including in classes such as science that did not concern government-related issues. *Id.* ¶74. Those efforts included changes to curriculum and instructional materials. *E.g.*, *id.* ¶62-63.

- Defendants organized and promoted demonstrations for the "National School Walk-Out," a March 2018 event that called for a 17-minute classroom walkout in recognition of 17 people who had recently been killed at a school shooting in Parkland, Florida. *E.g.*, *id.* ¶30-31. Defendants pressured students to participate in that event, *id.* ¶67, and they permitted students to participate in the event without being marked absent from class. *Id.* ¶45.

- To conceal the above efforts, defendants lied to the public in order "to create the false public appearance that the activities were organized and led by students." *Id.* ¶42.

The question presented by this motion is whether the above allegations, if true, constitute a violation of plaintiffs' rights to free speech under the First Amendment. The answer is no.

**4.     Argument**

The First Amendment provides in part that "Congress shall make no law … abridging the freedom of speech[.]" The Supreme Court has held that the guarantee of free speech not only protects an individual's right to speak, but also protects an individual's "right to refrain from speaking at all"—that is, a right not to be compelled by the government to speak. *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). That is the right at issue in this case.

There are "two categories of cases" in which the First Amendment prohibits such compelled expression. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005). The first is "true 'compelled speech' cases," in which "an individual is obliged personally to express a message he disagrees with, imposed by the government," and the second is "'compelled subsidy' cases," in which "an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." *Id.*

Plaintiffs in this case pursue both theories. Both theories fail to state a claim on the facts alleged.

a.    <u>Plaintiffs' Compelled-Speech Theory Fails to State a Claim.</u>

i.    *Compelled speech requires compulsion.*

The seminal case in the compelled-speech context is *Board of Education of West Virginia v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). In *Barnette*, a West Virginia law required students in public schools to recite the Pledge of Allegiance. Students who failed to do so were expelled, and their parents were prosecuted. The Supreme Court readily found that the law was unconstitutional, explaining that the First Amendment does not allow the state "to compel [an individual] to utter what is not in his mind." *Id*. at 634. The Court described the right as freedom from "a compulsion of students to declare a belief." *Id.* at 631.

The same principle was before the court in *Wooley v. Maynard* in 1977, which concerned a New Hampshire law requiring vehicles to bear license plates that included the state motto, "Live Free or Die." 430 U.S. at 705. One defendant refused to comply by covering the motto on his license plate. He was convicted, fined, and sentenced to six months in jail. The Supreme Court described the issue as "whether the State may constitutionally require an individual to participate in the dissemination of an ideological message" by displaying it on his or her private property for public display. *Id*. at 713. The Court concluded that the state could not require such action, because "[t]he First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable." *Id*. at 716. The Court noted that the state had a legitimate interest in promoting appreciation of history, individualism, and state pride in various ways, but "such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Id*.

As both *Barnette* and *Wooley* make clear, "the crucial question" in a compelled-speech case "is whether… the government is *compelling* others" to espouse certain ideas or beliefs. *Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (italics in original). The doctrine forbids state action that "*forces* an individual … to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley*,

430 U.S. at 715 (italics added).  *See also R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 917 (9th Cir. 2005) ("[T]he First Amendment does not permit the government to force citizens to express beliefs that are not their own.").

For government action to give rise to such a claim, it is not enough that the plaintiff feels pressured to speak or feels inhibited from speaking.  *See, e.g.*, *Laird*, 408 U.S. at 11 (a plaintiff challenging government action under the First Amendment "must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.  …Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."); *Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed. 2d 669 (1971) (plaintiffs in a First Amendment claim had no standing where they merely alleged that a state law caused them to "feel inhibited" from expressing certain ideas).

Rather, "a violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005).  "Actual compulsion" does not require the threat of criminal consequences, as were present in both *Barnette* and *Wooley*.  But "[i]n order to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'"  *Phelan*, 235 F.3d at 1247 (quoting *Laird*, 408 U.S. at 11).  For instance, if the school in *Barnette* relied not on expulsion and prosecution but instead gave a failing grade to students who refused to say the Pledge of Allegiance, its action likely would still be sufficiently "compulsory" to give rise to a compelled-speech claim.  But if the school merely encouraged reciting the Pledge of Allegiance by telling students that it is the right and patriotic thing to do, no such claim would arise.  In other words, the government's action "must impose a specific collateral injury" for failure to comply.  *Id.*  As the Sixth Circuit summarized, "in the absence of *state mandated penalties* coercing an individual to choose a course of conduct, state compulsion has not been found." *Wilkins v. Daniels*, 744 F.3d 409, 415 (6th Cir. 2014) (italics added).

ii.    *Plaintiffs fail to allege compulsion.*

Here, plaintiffs' compelled-speech claim, entitled "Compelled Speech (Social and Peer Pressure)," fails to state an actionable claim under the First Amendment because plaintiffs do not allege facts showing that the government "compelled" them to speak.  On the facts alleged, plaintiffs were free to attend or not to attend the demonstrations at issue, and they were free to voice a dissenting view.  Plaintiffs do not allege that, had they done so, defendants would have taken any kind of regulatory or punitive action against them.  Rather, plaintiffs allege that they felt "social and peer pressure" to express a pro-gun-control view as a result of the "atmosphere" defendants' views and actions created.  Their claim alleges:

> "The circumstances leading up to the March 14th demonstration, including emotional consciousness- (and really fear-) raising by teachers, postering campaigns and direct solicitation of student input, combined to create a *coercive atmosphere* within the schools that put the student plaintiffs under compulsion to participate in the March 14th demonstrations and other anti-gun-related activities, as well as to chill and to suppress the rights of PPS students and their parents who opposed the PPS anti-gun agenda."

FAC ¶98 (emphasis added).

Plaintiffs' theory is unfounded in the law.  Such subjective allegations are insufficient under the standards that govern a compelled-speech claim, because the First Amendment does not protect an individual from feeling "pressured" by one's community.  Plaintiffs were not forced by the government to say, or not to say, anything.  Plaintiffs' allegations do not give rise to a compelled-speech claim.[2]

b.    Plaintiffs' Compelled-Subsidization Theory Fails to State a Claim.

Plaintiffs' First Amendment claim is also asserted under a second, closely related theory of "compelled subsidization."  As the Supreme Court has explained, "[t]he reasoning of [our]

---

[2] For the same reason, plaintiffs have failed to allege facts sufficient to show they have standing. The denial of First Amendment rights is sufficient to confer standing, *e.g., Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1280 (9th Cir. 2003), but as described above, the facts alleged in this case do not rise to a denial of plaintiffs' First Amendment rights.

compelled-speech cases has been carried over to certain instances in which individuals are compelled not to speak, but to subsidize a private message with which they disagree." *Johanns*, 544 U.S. at 557.

As noted in *Johanns*, the theory of compelled subsidization has been applied to invalidate government exactions in only "certain circumstances." In particular, two related principles narrowly limit its application. First, the First Amendment prohibits only compelled subsidization of *private* speech. It does not prohibit compelled subsidization of *government* speech. And second, the First Amendment does not prohibit *all* compelled subsidization of private speech. It prohibits such subsidization only when the resulting harm (if any) to one's associational rights is not outweighed by a sufficient governmental purpose. The Supreme Court has summarized the theory this way: "[B]eing forced to fund someone else's *private* speech *unconnected to any legitimate government purpose*" violates the First Amendment. *Id.* at 565.

Here, plaintiffs' compelled-subsidization claim fails chiefly because what plaintiffs complain they were required to "subsidize" was government speech—that is, PPS' alleged decisions regarding whether to take political positions and regarding how and what its teachers should teach.

> i.     *The First Amendment does not prohibit compelled subsidization of government speech.*

The compelled-subsidization analysis applies only to the speech of private citizens, and not that of the government itself. "Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech." *Johanns*, 544 U.S. at 563. *See also, e.g.*, *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460, 467, 129 S.Ct. 1125, 172 L.Ed. 2d 853 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

That is because "[i]t is inevitable that government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens." *Bd. of Regents of Univ. of Wisconsin*

*Sys. v. Southworth*, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000).  If the

government's decisions about which policies to favor were subject to First Amendment

restrictions, "it is not easy to imagine how government could function" at all.  *Id.* at 468.  The

Supreme Court has explained:

> "[I]mposing a requirement of viewpoint-neutrality on government
> speech would be paralyzing. When a government entity embarks
> on a course of action, it necessarily takes a particular viewpoint
> and rejects others. The Free Speech Clause does not require
> government to maintain viewpoint neutrality when its officers and
> employees speak about that venture."

*Matal v. Tam*, -- U.S. --, 137 S.Ct. 1744, 1757, 198 L.Ed. 2d 366 (2017).

In sum, there is no constitutional "right to insist that no one paid by public funds express

a view with which [one] disagree[s.]"  *Keller v. State Bar of California,* 496 U.S. 1, 12–13, 110

S.Ct. 2228, 110 L.Ed. 2d 1 (1990).  "Compelled support of government—even those programs of

government one does not approve—is of course perfectly constitutional, as every taxpayer must

attest."  *Johanns*, 544 U.S. at 559.

> ii.    *Plaintiffs' compelled-subsidization claim concerns only government*
> *speech.*

Here, the speech plaintiffs complain of having had to "subsidize"—for instance, PPS'

alleged decisions regarding whether to take political positions and regarding how and what its

teachers are to teach—is the very definition of government speech.  *See, e.g.*, *Rosenberger v.*

*Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed. 2d 700

(1995) ("When the University determines the content of the education it provides, it is the

University speaking, and we have permitted the government to regulate the content of what is or

is not expressed when it is the speaker or when it enlists private entities to convey its own

message."); *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) ("[T]he selection of textbooks by

the state for use in public school classrooms is government speech" and therefore "is not subject

to [a] viewpoint neutrality requirement" under the First Amendment); *Griswold v. Driscoll*, 625

F. Supp. 2d 49, 54 (D. Mass. 2009), *aff'd on other grounds*, 616 F.3d 53 (1st Cir 2010)

("[Determining] the curriculum that will be taught in public school classrooms … is a form of government speech, which is not generally subject to First Amendment scrutiny.  There is no requirement that such government speech be balanced or viewpoint neutral.").

The Ninth Circuit's opinion in *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000), illustrates the governing principle and is squarely controlling in this case.  In *Downs*, the Los Angeles Unified School District in 1997 issued a memorandum announcing recognition of each June as "Gay and Lesbian Awareness Month," described as "a time to focus on gay and lesbian issues."  *Id.* 1006.  The memorandum prohibited in-school discrimination against gays and lesbians and notified school staff and administrators that the district "would provide posters and materials in support of Gay and Lesbian Awareness Month"—some of which it acknowledged were "controversial in nature"—for display in schools.  *Id.* at 1006.

In addition to those materials, one high school in the district erected a bulletin board on which faculty and staff could post their own materials related to Gay and Lesbian Awareness Month, some of which they had obtained "from outside organizations."  *Id.* at 1011.  Those bulletin board materials included, for example, rainbow flags, a poster titled "Diversity is Beautiful," a poster titled "What is a Family," a chart reflecting statistics on hate crimes, and a sheet explaining common gay and lesbian symbols such as the pink triangle.  *Id.* at 1006.

Plaintiff Robert Downs, a teacher who objected to the school's recognition of Gay and Lesbian Awareness Month, created his own bulletin board in the school hallway.  On that bulletin board, which he entitled "Redefining the Family," he posted materials expressing his view that homosexuality is immoral.  *Id.* at 1006-07.  After complaints from other faculty that his materials were "upsetting" and "objectionable," the school's principal ordered Downs' materials to be removed.  *Id.* at 1007.  Mr. Downs sued, complaining that the school district had impermissibly taken sides on a controversial issue rather than remaining "viewpoint-neutral," and that by prohibiting him from voicing his opposing view in the hallway, it had violated his rights to free speech under the First Amendment.  *Id.* at 1008.

The district court rejected Mr. Downs' theory, and the Ninth Circuit affirmed. The appellate court explained that "[this] is a case of the government itself speaking, whether the government is characterized as Leichman High, LAUSD, or the school board." *Id.* at 1011. And when the government itself speaks, "its control of its own speech is not subject to the constraints of constitutional safeguards and forum analysis[.]" *Id.* at 1013. "The LAUSD school board is elected by the public, and until its current members are voted out of office, they 'speak' for the school district through the policies they adopt." *Id.* at 1016. In doing so, the school board "may decide not only to talk about gay and lesbian awareness and tolerance in general, *but also to advocate* such tolerance if it so decides, and restrict the contrary speech of one of its representatives." *Id.* at 1014 (italics added).

In short, "[v]iewpoint neutrality … does not apply" to the decisions of the high school, the school district, or its school board regarding their own positions on controversial issues. *Id.* at 1011. Notably, that was true in *Downs* even through "faculty and staff members may have received materials from outside organizations" for posting on the school's bulletin boards. *Id.* Regardless of the materials' origin, the school authorities' acceptance and display of those materials "was equivalent to Leighman High, LAUSD, and the school board itself speaking." *Id.* at 1012.

The same is true here. Under *Downs*, an alleged decision by PPS to adopt a particular position—even if that position concerns a matter of political controversy, such as gun control or LGBT rights—constitutes government speech. A school district, through board action or through its employees, is entitled "not only to talk about" that issue "but also to advocate" for its chosen position. *Id.* at 1014. It may do so by imposing restrictions on its own employees, by limiting what may be displayed on school grounds, or even through changes in curriculum. *Id.* at 1013. *See also, e.g.*, *Chiras*, 432 F.3d at 614 (school curriculum is "government speech").[3] The

---

[3]      Of course, that principle has a hard and clear limit. While a public school is entitled to restrain or mandate expression in contexts that it controls—including its hallways, its instructional materials, and its employees—a school may not compel its *students* to voice a

actions that plaintiffs allege defendants took in this case—in short, voicing support for gun control, and encouraging students in various ways to do the same—constitute government speech.  As a result, no compelled-subsidization claim arises from the facts alleged.

> iii.    *Plaintiffs have not alleged facts showing compelled subsidization of private speech.*

Plaintiffs, evidently aware that there is no First Amendment right not to subsidize government speech, make the following allegations:

> 92.  Defendants made, and continue to threaten to make, plaintiffs and their children instruments for fostering public adherence to views they oppose.
>
> 93.  In substance, defendants converted a portion of plaintiffs' local tax payments into forced contributions to political messages they oppose, and threaten to continue to do so.
>
> 94.  *This political messaging was not primarily speech by the government itself, but the speech of private actors*, the students mobilized by defendants to speak in favor of gun control.

FAC ¶92-94 (emphasis added).

Plaintiffs' attempt to disclaim the notion of "government speech" is baseless and contrary to their own allegations.  Plaintiffs' First Amendment claim is founded on the allegation that the demonstrations at issue were *not* a product of students' own expression but were in fact the work of defendants.  *See, e.g.*, FAC ¶39 (although defendants claimed to be merely "allowing students to express their views," such "self-serving statements were directly contrary to defendants' actual actions, as defendants were in fact organizing and facilitating the demonstrations…"); *id.* ¶42 ("PPS was attempting to use the students as proxies in this effort and were at great pains to create the false public appearance that the activities were organized and led by students…"); *id.* ¶44 ("The motive and goal of defendants was to create through their policy choices widely

---

particular view.  To do so would violate the "compelled speech" principle described at Section 4(a) above. But as described in that section, government compulsion of speech occurs only when the government in fact *compels* that speech by force of governmental power.  Plaintiffs have not alleged facts showing such compulsion.

Page 14 –    **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST CLAIM FOR RELIEF AND MEMORANDUM IN SUPPORT**

publicized events which they could falsely portray as primarily the product of student initiative, rather than accurately understood as the product of defendants' political policy choice…"); *id.* ¶49 (students "were pressed into service as pawns and props").  Having founded their claim on the theory that the students were merely "proxies" that defendants used to express defendants' own views, plaintiffs cannot in the same breath contend that the speech at issue was *not* that of defendants, but that "of private actors."  Plaintiffs cannot have it both ways.

Moreover, the law is well-established that government speech remains government speech for purposes of a First Amendment claim even when the government carries out that speech through non-governmental third parties.  *See, e.g.*, *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 674, 118 S.Ct. 1633, 140 L.Ed. 2d 875 (1998) (a public broadcaster's programming constitutes "government speech" even when it "involve[s] the compilation of the speech of third parties").  If, as plaintiffs allege, the students were merely "proxies" for defendants' expression of their own views, then that expression remains government speech.

Even if one were to assume that plaintiffs' compelled-subsidization claim concerns "the speech of private actors" rather than expressions of defendants' own views, plaintiffs' allegations still would be insufficient to state a claim for at least three reasons.  First, on the alleged facts, there was no "subsidization" because any support provided was not monetary.  Second, no harm to associational rights arose, because the only expenditures at issue concerned the use of general tax revenue.  And third, even on the facts alleged, any "subsidization" advanced a legitimate government purpose—seeking to increase safety and reduce gun violence in Oregon's public schools.

First, the compelled-subsidization cases have uniformly concerned the following question: under what circumstances does the First Amendment prohibit the government from requiring someone to *pay money to a private party* and thereby subsidize the private party's speech?  For instance, the Supreme Court's most recent compelled-subsidization case, *Janus v. American Federation of State, County, & Municipal Employees*, -- U.S. --, 138 S.Ct. 2448, -- L.Ed. 2d -- (2018), struck down an Illinois law that forced all public employees to pay a fee to an

employee union (a private organization), even if they refused to join the union and disagreed with the public policy positions that it advocated for.  Similarly, in *Keller v. State Bar of California*, 496 U.S. at 16, the Supreme Court held that the State of California could not force individuals to pay dues to the state bar—a private, professional association—that would be used for its political advocacy.

Defendants are unaware of any case invalidating government action on compelled-subsidization grounds that did not involve a requirement that plaintiffs *pay* the private party at issue.  Indeed, when one case presented a theory outside those bounds, the Supreme Court expressly rejected it.  In *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed. 2d 156 (2006), a group of law schools challenged the Solomon Amendment, which effectively required higher education institutions to allow access to military representatives to conduct recruitment.  The law did not require schools to pay military recruiters, but the Third Circuit had nevertheless concluded that the law unconstitutionally compelled the subsidization of speech "by putting demands on the law schools' employees and resources."  The Supreme Court reversed.  Among other reasons—chief among which was that military recruitment "is clearly government speech"—the Supreme Court also stated "[w]e do not consider the law schools' assistance to raise the issue of subsidizing Government speech as that concept has been used in our cases," in part because that assistance is "not of a monetary nature[.]"  *Id.* at 61 n.4.

Here, plaintiffs pursue a similar theory to that rejected in *Rumsfeld*.  Plaintiffs do not allege that they were required by the government to pay money to a third party whose views they oppose; rather, they allege that defendants diverted school time and instructional content toward a view they oppose.  Because such alleged subsidization is "not of a monetary nature," it cannot support a compelled-subsidization claim.

Second, as stated above, the right at issue in a compelled-speech or compelled-subsidization claim is one's right not to be personally associated with a view that one does not support.  That right is not implicated where, as here, the "subsidization" at issue is the payment

Page 16 –    **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST CLAIM FOR RELIEF AND MEMORANDUM IN SUPPORT**

of a general tax—because the government's expenditure of such tax revenue is not held out to represent the views of any particular taxpayer.

Where private parties complain that the government has compelled them to engage in or subsidize particular expression, "[t]he key analysis is whether the private parties 'are closely linked with the expression in a way that makes them appear to endorse the government message.'" *New Doe Child #1 v. Congress of United States*, 891 F.3d 578, 593 (6th Cir. 2018) (quoting *Johanns*, 544 U.S. at 565 n.8).  Stated differently, the question is whether, to an observer, the expression would be associated with or attributed to the plaintiffs in particular rather than to the government.

Where the danger of such attribution to the individual is absent, courts have rejected compelled-speech claims.  In *Johanns*, for example, the Supreme Court rejected several beef producers' compelled-speech challenge to mandated funding of industry advertisements because the record contained no evidence that the advertisements in question "were attributed to respondents."  544 U.S. at 565.  Similarly, in *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 471, 117 S.Ct. 2130, 138 L.Ed. 2d 585 (1997), the Supreme Court rejected several fruit growers' compelled speech claims in part because the expressions at issue were "attributed not to them, but to the California Tree Fruit Agreement" established by the state.  And in *PruneYard Shopping Center v. Robbins*, 447 U.S. 74, 85-87, 100 S.Ct. 2035, 64 L.Ed. 2d 741 (1980), the Supreme Court rejected the argument that a shopping center's owner has a First Amendment right not to be forced to allow the public to use its property for circulating pamphlets or signature-gathering.  The Court explained that because the property was open to the public, "[t]he views expressed … will not likely be identified with those of the owner." *Id.* at 87.  Thus, no First Amendment claim arose.

By the same token, there is no danger of a government expenditure of tax revenues being identified with or attributed to a particular taxpayer. Once tax revenue is collected, it constitutes government resources that are not associated with any taxpayer individually. Because

defendants' alleged actions in this case are not identified with or attributed to plaintiffs as individual taxpayers, no First Amendment claim arises.[4]

It is unsurprising, then, that no court of which defendants are aware has ever invalidated a government action on the basis that a general tax represented "compelled subsidization."  Indeed, if such a claim were cognizable, one can imagine the deluge of litigation that would result, as taxpayers who disagree with the views expressed as a result of a particular government expenditure—for instance, those expressed in a study funded by the National Science Foundation or a grant from the Oregon Arts Commission—might insist on a First Amendment right not to pay the corresponding portion of their income taxes.  Of course, no such claim is cognizable. *See, e.g.*, *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) ("[The issue of] taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same … The bare suggestion of such a result … [shows] that a suit of this character cannot be maintained.").

Third and finally, even when government action mandates the monetary subsidization of private speech in a way that that *does* cause a harm to an individual's associational rights, the First Amendment prohibits that action only when that harm is not outweighed by the advancement of a sufficient government interest.  Thus, "being forced to fund someone else's

---

[4]      For the same reason, plaintiffs' allegations are again insufficient to show standing. Plaintiffs allege that, as taxpayers, they may sue to ensure that their tax payments are spent in ways that the Constitution permits. FAC ¶93.  But "[a]s the Supreme Court has repeatedly held, a taxpayer's interest in ensuring that appropriated funds are spent in accordance with the Constitution does not suffice to confer Article III standing." *In re Navy Chaplaincy*, 534 F.3d 756, 761 (D.C. Cir. 2008); *see also Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) ("[I]t is a complete fiction to argue that an unconstitutional federal expenditure causes an individual federal taxpayer any measurable economic harm."); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) ("[Our] rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers.").

private speech *unconnected to any legitimate government purpose*" violates the First Amendment.  *Johanns*, 544 U.S. 565 (italics added); *see also, e.g.*, *Glickman*, 521 U.S. at 471 (the First Amendment prohibits compelled subsidization of speech that is made "without sufficient justification by the government"); *Janus*, 138 S.Ct. at 2464-65 (requiring, in the commercial-speech context, a "compelling government interest").

As the exhibits attached to plaintiffs' First Amended Complaint illustrate, the defendants' alleged actions in this case were taken due to a stated "need for the nation's major city school systems to express their positions on school safety matter that affect their students and the children residing in their cities" so they could, for instance, "plan for the possibility of such acts of violence, coordinate with law enforcement, and secure their buildings from intruders," and "identify and work with students showing warning signs for depression and violence."  FAC Ex. 33.  Helping to keep public schools safe from acts of gun violence is not merely a "legitimate" interest of government, it is among the most compelling needs faced by today's public schools. Plaintiffs may disagree with defendants' views regarding how best to address those needs, but the First Amendment does not give plaintiffs a right to be shielded from views with which they disagree.

Because plaintiffs' First Amended Complaint fails to state a cognizable claim for violation for the First Amendment, that claim should be dismissed under Fed. R. Civ. P. 12(b)(6).

DATED this 17th day of May, 2019.

HARRANG LONG GARY RUDNICK P.C.

By: ____s/J. Aaron Landau_____
    J. Aaron Landau, OSB #094135
    Of Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify that on May 17, 2019, I served or caused to be served a true and complete copy

of the foregoing **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST CLAIM**

**FOR RELIEF** on the party or parties listed below as follows:

☑    Via CM / ECF Filing

☐    Via First Class Mail, Postage Prepaid

☐    Via Email

☐    Via Personal Delivery


James Buchal, OSB 921618
jbuchal@mbllp.com

Attorney for Plaintiffs

HARRANG LONG GARY RUDNICK P.C.


By:  s/J. Aaron Landau
    William F. Gary, OSB #770325
    J. Aaron Landau, OSB #094135
    Of Attorneys for Defendants