James L. Buchal, OSB #921618
E-mail:  jbuchal@mbllp.com
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR  97214
Tel:    503-227-1011
Fax:    503-573-1939
*Attorney for Plaintiffs*

HONORABLE JUDGE JOLIE A. RUSSO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LUCAS BURWELL; MICHELLE YARBROUGH; KATHERIN KIRKPATRICK; CHRISTOPHER S. JOHNSON; and M.S., by and through the custodial parents, KUMIKO SCHOW and GLENDEN HEAGY<br><br>            Plaintiffs,<br><br>            v.<br><br>PORTLAND SCHOOL DISTRICT NO. 1J by and through the PORTLAND SCHOOL BOARD, an Oregon public school entity; and GUADALUPE GUERRERO in his official capacity as Superintendent of Portland School District No. 1J,<br><br>                        Defendants. | No.  3:19-CV-00385JR<br><br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>(Oral Argument Requested) |

# TABLE OF CONTENTS

Table of Authorities ......................................................................................... iii

Summary of Argument ......................................................................................1

I.      STATEMENT OF FACTS .........................................................................3

Argument ...........................................................................................................11

II.      THE APPROPRIATE STANDARD OF REVIEW .............................................11

     A.      Application of Rule 12 of the Federal Rules of Civil Procedure .............11

     B.      The Significance of *Janus v. AFSCME, Council 31* ..................................12

III.      THE FIRST AMENDMENT PROHIBITED PPS FROM COMPELLING
     PLAINTIFFS TO PAY FOR STUDENT DEMONSTRATIONS .......................14

     A.      The Speech Here Was Not "Government Speech" Beyond First
     Amendment Review...............................................................................17

         1.      Students are private actors, not government speakers ..................18

         2.      Lawless conduct cannot be government speech ...........................21

         3.      PPS' improper motives support plaintiff's First
         Amendment claim ........................................................................22

     B.      PPS' Conduct Undermines the Most Fundamental Purposes of the First
     Amendment............................................................................................24

     C.      PPS' Attempts to Invent Further Limitations on the Doctrine
     Prohibiting Compulsory Subsidization Should Be Rejected ...................26

         1.      Cash payments to private parties are not required to prove
         plaintiffs' claims ..........................................................................26

         2.      Plaintiffs need not prove they will be personally identified with
         the groups of demonstrating students ...........................................27

         3.      That the payments are made through local taxes does not
         excuse the conduct .......................................................................28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

IV.    THE FIRST AMENDMENT FORBIDS PPS' COMPULSION TO
       SUPPORT GUN CONTROL PROTESTS ............................................................29

Conclusion ...........................................................................................................32

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Bd. of Ed.,*
    431 U.S. 209 (1977)........................................................................................15

*ACLU of Florida, Inc. v. Miami-Dade County School Board,*
    557 F.3d 1177 (11th Cir. 2009) .......................................................................23

*Alabama Libertarian Party v. Birmingham,*
    694 F. Supp. 814 (N.D. Ala. 1988)..................................................................28

*Arkansas Educ. TV Comm'n v. Forbes,*
    523 U.S. 666 (1998).........................................................................................20

*Ashcroft v. Iqbal,*
    556 U.S. 663 (2009).........................................................................................11

*Bain v. Cal. Teachers Ass'n,*
    891 F.3d 1206 (9th Cir. 2018) .........................................................................11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).........................................................................................11

*Board of Education v. Pico,*
    457 U.S. 853 (1982)....................................................................................20, 23

*Board of Regents v. Southworth,*
    529 U.S. 217 (2000)......................................................................19, 20, 24, 29

*Carman v. Woodruff,*
    10 Or. 133 (1882)............................................................................................28

*C.N. v. Ridgewood Board of Education,*
    430 F.3d 159 (3d Cir. 2005).............................................................................31

*Comeaux v. WWID,*
    315 Or. 562 (1992)..........................................................................................28

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
    473 U.S. 788 (1985).........................................................................................22

*Doe v. Congress of United States,*
    891 F.3d 578 (6th Cir. 2018) ...........................................................................27

*Downs v. Los Angeles Unified School District,*
    228 F.3d 1003 (9th Cir. 2000) .........................................................................20

*Flast v. Cohen,*
    392 U.S. 83 (1968)...........................................................................................28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Glickman v. Wileman Bros. & Elliott, Inc.,*
    521 U.S. 457 S.Ct. 2130, 138 L.Ed. 2d 585 (1997)...............................27

*Gruber v. Oregon State Bar,*
    No. 3:18-cv-1591-JR (D. Or. April 1, 2019) ......................................26

*Janus v. AFSCME, Council 31,*
    138 S. Ct. 2448 (2018)......................................................... *passim*

*Johanns v. Livestock Mktg. Ass'n,*
    544 U.S. 550 (2005).................................................2, 13, 15, 27

*Kania v. Fordham,*
    702 F.2d 475 (4th Cir. 1983) ...........................................25

*Keller v. State Bar of Cal.,*
    496 U.S. 1 (1990)...................................1, 2, 15, 16, 19

*Keyishian v. Board of Regents,*
    385 U.S. 589 (1967) ...................................................14

*Laird v. Tatum,*
    408 U.S.1 (1972)........................................................32

*Lamb's Chapel v. Ctr. Moriches Union Free School Dist.,*
    508 U.S. 384 (1993) ...................................................18

*Lee v. Weisman,*
    505 U.S. 577 (1992) ...................................................30

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923)...................................................28

*Matal v. Tam,*
    137 S. Ct. 1744 (2017)................................................17

*Mills v. Alabama,*
    384 U.S. 214 (1966).....................................................3

*Mountain States Legal Foundation v. Denver School Dist.,*
    459 F. Supp. 357 (D. Colo. 1978)........................15, 16, 26

*Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trustees,*
    235 F.3d 1243 (10th Cir. 2000) .......................................31

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009)...................................................21

*Pratt v. Independent School Dist.,*
    670 F.2d 771 (8th Cir. 1982) .........................................24

*Pruneyard Shopping Ctr. v. Robins,*
    447 U.S. 74 (1980).....................................................28

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................................................18

*Rounds v. Oregon State Bd. of Higher Educ.*,
    166 F.3d 1032 (9th Cir. 1999) ..............................................................11, 13, 14

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) .....................................................................................26, 27

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ........................................................................................1

*Stanson v. Mott*,
    17 Cal. 3d 206 (1976) ....................................................................................25

*Tinker v. Des Moines Indep. Cmty. School Dist.*,
    393 U.S. 503 (1969) ......................................................................................24

*United States v. Carolene Products Co.*,
    304 U.S. 144 (1938) ......................................................................................24

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    135 S. Ct. 2239 (2015) ..................................................................................21

*W. Va. Bd. of Educ. V. Barnette*,
    319 U.S. 624 (1943) ........................................................................................1

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .................................................................................29, 30

**State Statutes**

ORS 332.005 ........................................................................................................4

ORS 332.067(1)(a) .............................................................................................22

ORS 332.072 ......................................................................................................19

ORS 332.075(b) ...................................................................................................4

ORS 337.120 ......................................................................................................22

ORS 339.010 ......................................................................................................21

ORS 339.010(1) ...................................................................................................4

ORS 339.055 ......................................................................................................21

ORS 339.065(2) ..................................................................................................21

ORS 339.215 ......................................................................................................13

ORS 339.240 ........................................................................................................4

ORS 339.312 ......................................................................................................13

ORS 339.331 ...................................................................................................13

**State Rules**

OAR 581-012-050 ...........................................................................................4

OAR 581-021-0046 .........................................................................................21

OAR 581-021-0055 .........................................................................................22

OAR 581-021-0077 .........................................................................................21

OAR 581-022-2350 .........................................................................................22

OAR 582-020-0035(1)(b) ............................................................................8, 21

**Additional Authority**

Chap. 93, Or. Laws 2014 ..............................................................................13

G. Klass, *The Very Idea of a First Amendment Right Against Compelled Subsidization*,
    38 U.C. Davis L. Reb. 1087 (2005) ........................................................25

J. Blocher, *Viewpoint Neutrality and Government Speech*,
    52 B.C. Law Rev. 695 (2011) ................................................................24

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## Summary of Argument

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). And nowhere is that more true than where, as here, defendants (hereafter "PPS") have so utterly repudiated the longstanding American understanding that "[f]ree public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party or faction." *W. Va. Bd. of Educ. V. Barnette*, 319 U.S. 624, 637 (1943).

Specifically, plaintiff's Count 1 challenges the compulsory subsidization of massive anti-gun, anti-civil rights demonstrations by school students and others to the detriment of not only the First Amendment rights of dissenting parents and students, but also to the very marketplace of ideas itself that is the core object of First Amendment protection. Simply put, PPS has weaponized the Portland schools to advance the political goals of its controlling officials and outside allies, and to ostracize, silence and intimidate all who support the Second Amendment.

This case must be evaluated under the new standards of the Supreme Court's 2018 case *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018), which confirms that "strict" or "exact scrutiny" applies to claims of compulsory subsidization of objectionable speech such as that organized by PPS. PPS's conduct cannot withstand such scrutiny. PPS stands in the shoes of the California State Bar, which the Supreme Court easily found was forbidden under the First Amendment from using compulsory funds to proselytize for gun control in *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990).

Having repeatedly and publicly assured Portland that PPS was without power to participate in, facilitate, organize or even condone any student walkouts (¶ 39[1]), PPS now, in

---

[1] All references cited by "¶" refer to paragraphs in plaintiffs' First Amended Complaint.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

substance, *embraces* plaintiffs' allegations that it misrepresented a campaign to indoctrinate and utilize students to advance political and ideological goals, claiming that the mass student demonstrations all over Portland were, as a matter of law, PPS's own "government speech". (*See* Dft. Mtn. 14-15). PPS is attempting to exploit *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005), in which a divided Supreme Court upheld compulsory subsidization of generic beef advertising deemed "the Government's own speech". As the wealth of precedent discussed below demonstrates, federal courts routinely distinguish between speech concerning core political and ideological beliefs, the fundamental object of First Amendment protection, and things like beef advertising.

Under *Keller*, "government speech" doctrine has no application to speech not "germane" to the lawful mission of the entity claiming that the speech is beyond First Amendment challenge. It has no application to speech by private citizens, much less speech that is in violation of law, policy and practice. PPS argues a number of other limitations on the constitutional prohibition against subsidizing private political activism, but all are premised on misuse of the cases cited.

As to Count 2, which addresses the compulsion placed upon PPS students to participate in these demonstrations, PPS denies the coercion was of constitutionally-significant magnitude. PPS does not deny using oppressive tactics to create a profoundly-coercive political atmosphere, but argues that only formal punishment of dissenting students would trigger constitutional protections.

The circumstances of primary and secondary education make the environment uniquely coercive for such students, and allowing students to be bullied for their conservative beliefs (or worse, bullying them directly), raises issues of constitutional magnitude where core political

speech is concerned. The complaint's allegations of coercion must be taken as true as a factual matter on a motion to dismiss and are more than sufficient under the Supreme Court's First Amendment precedents. The cases cited by PPS address entirely dissimilar circumstances, such as private survey responses by students, as to which any compulsion is of orders of magnitude less significant.

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). Where activists hijack massive amounts of government resources to promote a highly-contentious positions though mass demonstrations, the opposite effect is created *by design*: the creation of a climate to extinguish free discussion. Plaintiffs squarely allege that this was the motive and design of defendants, and allege the facts to support that inference. For both Count 1 and Count 2, defendants' motives are relevant to assessing the constitutionality of the conduct, and this Court cannot credit PPS' claim of benign "governmental" motives for purposes of this motion.

## I.     STATEMENT OF FACTS.

Defendants complain about some of the adjectives that plaintiffs used in reciting their conduct, but do not seriously dispute the well-pleaded factual allegations of the Amended Complaint. Their short, bullet-point list of allegations, however, fails to capture many important factual allegations of the Amended Complaint. The full story is important to understand the truly unprecedented nature of PPS's conduct.

The plaintiffs are all PPS parents and students. (¶¶ 3-5.) The parents pay taxes which support the operation of PPS. (¶ 6.) PPS is a school district within the State of Oregon and

Multnomah County, with authorities and powers as established in ORS Chapter 332, and controlled by the directors of the Portland School Board as provided in ORS 332.005. (¶ 7.) Conspicuously absent from ORS Chapter 332 or any of the other provisions of law to which it refers is the notion that the "courses of study" within the power of the PPS Board to adopt (*see* ORS 332.075(b)) include organizing and encouraging mass exoduses from Portland classrooms to put political pressure on politicians.

Indeed, far from authorizing PPS to foment student demonstrations, "state law requires Plaintiffs' children "to regularly attend a public full-time school during the entire school term." ORS 339.010(1). PPS has itself adopted a formal policy, pursuant to ORS 339.240 & OAR 581-012-050, confirming that "[s]tudents have the right to an education and the Board intends to protect that right in the event of a demonstration or other disorder disruptive to the school environment" (¶ 81 & Ex. 49). PPS has formally declared that demonstrations are not part of the educational mission of the school (until now), and adopted detailed rules of student conduct which require, among other things, that teachers must "keep students in classrooms [during demonstrations] and proceed with the usual lesson plans and activities". (¶ 83 & Ex. 50.) The student conduct rules state that any student daring to participate in a demonstration will "be given a five-minute warning to cease and desist in the demonstration and notified that failure to comply will result in immediate suspension from school". (¶ 83 & Ex. 50.) Of course, PPS may not waive or bend such policies to support particular political positions it favors.

On February 14, 2018, school shootings occurred in Parkland, Florida, that plaintiffs allege were proximately caused by the failure of that school district to hold the shooter accountable for his misconduct on literally dozens of prior occasions—a policy regrettably followed by PPS as well. (¶¶ 11-14.) Defendants, however, believe that banning nearly all

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

modern weapons in common use by law-abiding citizens might somehow improve school safety (*e.g.*, ¶¶ 50-51 & Ex. 33), and are indifferent or actively hostile to the fundamental civil right of plaintiffs and others under the Second Amendment to bear arms (see generally ¶¶ 15-20).

At all relevant times, PPS and those acting in concert with it have made public statements intended to foster a public perception that "gun control is absolutely an education issue" (*E.g.*, ¶ 28)—in substance the position PPS now presents in opposition to this motion. PPS and those acting in concert with it have also attempted to reframe student walkouts as "educational opportunities" to be supported by the District. (¶ 29.)

PPS complains about plaintiffs' pleading that these and other statements were cover for a true motive of putting "political, ideologically-based . . . pressure on elected leaders to support gun control". (Dfts. Mtn. 4 (quoting ¶ 29).) However, as set forth below, motive is important in First Amendment cases, and plaintiffs have plausibly supported their claims that PPS was not motivated by a desire to educate (which could be accomplished by presenting competing viewpoints), but to secure gun control legislation. Plaintiff's well-pleaded facts demonstrating this motive cannot be denied on this motion.

Almost immediately in the wake of the Parkland shooting, numerous PPS officials from the School Board on down demonstrated a primary motive of "lobbying" (*e.g.,* ¶ 22 & Ex. 3) "to pressure the government to enact tighter gun control laws" (¶ 30 & Ex. 14). When an activist group identified a "National School Walkout" as a means of such lobbying, multiple PPS officials began to circulate the third-party's plans and focus school resources upon facilitating such a walkout, openly advocating through PPS e-mail systems that school officials should "be connected" to the outside entities. (¶¶ 23-24.)

The overtly political and ideological nature of the conduct challenged herein cannot be

understated, and PPS officials actively involved anti-gun politicians in the development of the policy. (¶ 51.) They circulated to students written materials from local politicians encouraging student participation in the protests. (¶ 52.) While partisan, the activity was supported by substantial majorities of the local voters (*see* ¶ 18), and plaintiffs lack any political remedy (¶ 21).

PPS officials, in partnership with the outside political activist groups, began to identify particular students to assist them in leading demonstrations. (¶ 26.) Fostering such contact between outsiders and individual students, was, upon information and belief, a violation of state and federal law intended to protect "personally identifiable information" about PPS students. (¶ 27 (citing, *inter alia*, ORS 336.187).) The walkouts were posted on websites controlled by third-party antigun activists, and the participation of additional private citizens beyond students in the walkouts was encouraged ("parents and community members"). (¶¶ 31-32.)

While the lack of discovery at this stage prevents a full explanation of how, exactly, PPS determined to ignore its own policies and the law cited above in order to promote, proselytize and facilitate the antigun demonstrations, some PPS officials did initially object to what was going on as unlawful, prompting higher-level administrators to develop special "guidelines". (*See* ¶ 25.) PPS initially recognized that, under PPS's own policies, students participating in demonstrations should receive unexcused absences. (¶ 33.) Rejecting these restrictions as interfering with the overriding political objective of securing massive demonstrations, PPS officials, including School Board President Julia Brim-Edwards, were pushing to "support or enable student and staff participation in these events" (¶ 36).

In just two weeks, PPS had abandoned all formal policy in favor of the informal policy of encouraging mass demonstrations, demonstrating the degree to which the project supplanted all

conventional educational missions of PPS.  Defendant and Superintendent Guerrero in substance commanded each and every PPS principal to support the project.  (¶ 37.)

A key component of the effort was to intentionally mislead the public about PPS' role. Nominally, PPS officials continued to insist in multiple public releases and issuances to parents that PPS was powerless to "participate in or facilitate a student walkout" (¶ 39), as did its third-party political allies (¶ 40).  PPS administrators intervened at the local school level to try and create the false impression that the protests were "student centered," suggesting that school officials take particular students to lunch, a process plaintiffs correctly allege to be "groom[ing]" them to take the political action sought by PPS.  (¶ 43 & Ex. 26.)  Internally, it was clear that PPS was taking every available step to mobilize masses of children on the streets of Portland. (¶¶ 41-42.)

Contrary to any educational purpose, the viewpoints presented on gun control echoed the views of anti-gun activists, with no quarter given to any opposing views from third parties (¶¶ 43, 53).  Indeed, no quarter was given to any of the real causes of school shootings, and reasonable means to prevent them.  (¶ 60.)  PPS has refused permission for conservative opponents who could present this information even to appear in the schools.  (*See* ¶ 53.)

So-called educational materials advocating for radical gun control were hastily assembled in the wake of the Parkland shooting and adopted in violation of state requirements for curriculum (¶ 63); they were obtained from anti-gun organizations and were blatantly biased (*see* ¶ 59).  Some involved direct attacks on the Constitution and Second Amendment, in violation of Oregon law.  (¶ 81.)  Children were taught, and made posters which filled the walls of Portland schools, claiming that guns kill twice as many children as cancer does, and many other extravagant falsehoods.  (¶¶ 56-57.)  Others were naked appeals for political action, or direct and

irrational attacks on the Second Amendment.  (¶ 75.)  Children were taught political chants, like "Hey ho, hey ho, the NRA has got to go," which they later performed.  (¶ 58.)

Weeks prior to the demonstrations themselves, massive amounts of class time were devoted to the subject of school shootings in a one-sided scheme to indoctrinate and motivate students.  It was not enough to teach about school shootings in social studies; even science classes were hijacked for the effort.  (¶ 48.)  PPS prepared mock letters for children to send to politicians asking for gun control, and mobilized classes of children to write them—while misleading parents about the efforts.  (¶¶ 61-62.)

PPS required students to sit in circles talking about their feelings about school shootings. (¶ 64.)  PPS had students read materials prepared by anti-gun groups to have them parrot the speech of certain Parkland students seeking gun control, and training them in activism for gun control.[2]  (¶ 64.)  The efforts went beyond emotional manipulation of children; efforts were even discussed to manipulate the emotions of local politicians by inviting them to "lock down drills" so they could observe children terrified by PPS's fearmongering.  (¶ 55 & Ex. 37.)  All of this conduct violated Oregon educational regulations which declare that "[t]he ethical educator, in fulfilling obligations to the student, will. . . [r]efrain from exploiting professional relationships . . . in support of persons or issues".  OAR 582-020-0035(1)(b).

As a result of PPS' conduct, PPS created an atmosphere of anti-gun hysteria in which, in the words of one student, conservative views were "despised".  (¶ 66 & Ex. 45.)  Students who express conservative views on gun control and other issues are bullied in school by other students, or even teachers, with the tacit encouragement of PPS, which refuses to take action against the offenders.  (*See* ¶ 70.)  More generally, an ongoing campaign of political

---

[2] Significantly, the speech of Parkland students who supported the Second Amendment was not included in these materials.

indetrination activities has repeatedly instructed PPS students that conservative views are detrimental to their future, to the point where posters advertising gatherings for any remaining conservative student groups are obscenely vandalized without response from the PPS Administration. (¶ 71.)

It is for these reasons, coupled with the inherently coercive nature of primary and secondary education, that plaintiffs plead Count 2, alleging unconstitutional pressure on students to participate in the demonstrations. Some were obviously coerced; PPS officials even used as props special needs children who lacked any capacity to consent to carry anti-gun posters. (¶ 49.) More generally, PPS made it clear before the demonstrations that it expected all students to participate (¶ 67), celebrating the resulting "unity" afterwards in a way that underscored the necessity of participation (¶ 68), and made clear PPS's hostility to any dissenting opinions. Indeed, once classrooms were closed and the teachers themselves left for the demonstrations, dissenting students had nowhere to go unless they joined the demonstrations.

Defendants object to plaintiffs' characterization of their methods as "ingenious and remarkable" (Dft. Mtn. 4 (citing ¶ 45)), but the Court ought to be impressed by such previously unknown devices as shortening all regular classes and creating a special protest period, which even required reprogramming school bells, so as to avoid the requirement to mark unexcused absences (¶ 45). These allegations alone are sufficient to plead unlawful intent.

Repudiation of all Oregon law, regulation and policy concerning student attendance was also remarkable, with PPS advising students "you do not need to request parent/guardian permission to walk-out". (¶ 46 & Ex. 27.) Far from being threatened with suspension for participation in demonstrations, consistent with its own rules, PPS took pains to advise all concerned in advance that "students will not be punished". (¶ 84.)

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The priority PPS leadership placed on the partisan political objective of gun control to the detriment of all the things PPS was supposed to be doing cannot be understated. It was not just educational objectives that were sacrificed, but student safety as well. On March 14, 2018, the day of the first round of demonstrations, students at many schools were "observed to be running wildly and unsupervised in the streets" (¶ 47), involving a further raft of violations of law and policy beyond the scope of this memorandum.

Nor can the cost of scarce educational funding diverted to this effort be understated. PPS personnel all over Portland spent untold hours developing special materials like "Activist Info for Teens" (¶ 59 & Ex. 39), with substantial additional time spent circulating materials from anti-gun groups. A special website was produced. (¶ 73.[3]) Schools across Portland were littered inside and out with posters and banners using materials supplied by PPS. (*See* ¶¶ 56, 58) Professionally-edited videos of the demonstrations were produced for media distribution. (¶ 73.) The lost school time, another precious resource in an era where Oregon is widely mocked for the shortness of its school year, amounted to many millions of dollars, and continued after March 14th (¶¶ 76-77.) This imposes costs not just on plaintiffs as taxpayers, but upon the many Portland parents who have removed their children from PPS in recognition of its extraordinary politicization and must pay both for PPS and alternative schooling. (¶ 78.)

In the wake of the initial round of demonstrations, PPS officials publicly reiterated the false claim that the protests were student-driven, in statements calculated to ratchet up political pressure for gun control. (¶ 44.) Defendants believed—and reasonably so—that the false impression that the protests were the spontaneous upwelling of student concern would maximize their political value. (*Id.*) "It's for the children" is a well-worn political strategy, but not one

---

[3] Paragraph 64's reference to this website refers, incorrectly, to ¶ 69. It should refer to ¶ 73.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

that plaintiffs should be compelled to subsidize, or students to participate in.

## Argument

## II. THE APPROPRIATE STANDARD OF REVIEW.

### A. Application of Rule 12 of the Federal Rules of Civil Procedure.

To prevail on this motion, PPS must show "'beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief,' construing the complaint in the light most favorable to the plaintiff[s]". *Bain v. Cal. Teachers Ass'n*, 891 F.3d 1206 (9th Cir. 2018) (Rule 12(b)(6) standard; citations omitted). It is not just that plaintiffs can prove a set of facts consistent with the allegations of the complaint; multiple exhibits to the complaint—a part of the pleading for all purposes (Rule 10(c))—demonstrate that PPS itself repeatedly denied that "government speech" was involved. At the least, resolution of the constitutional questions presented by plaintiffs is commonly recognized to be a "fact-intensive inquiry" (*e.g., Rounds v. Oregon State Bd. of Higher Educ.,* 166 F.3d 1032, 1037 (9th Cir. 1999)), as to which a dismissal remedy is peculiarly inappropriate).

PPS cites two Supreme Court cases which are *sui generis*, and have no application to pleading standards here. The antitrust case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), found specific allegations of conspiracy based on no more than parallel conduct to be implausible. There is nothing implausible about plaintiff's case. In *Ashcroft v. Iqbal*, 556 U.S. 663 (2009), the Court rejected allegations of unconstitutional discrimination based on the roundup of large numbers of Arab Muslims in the wake of 9/11, finding that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice". *Id.* at 678. As set forth above, plaintiffs weave a rich tapestry of well-pleaded facts to support their case, not mere "threadbare recitals".

## B.     The Significance of *Janus v. AFSCME, Council 31.*

Much of the precedent cited by PPS must be re-examined in light of the Supreme Court's decision last year in *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018).  The *Janus* case resoundingly reaffirms that

> "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence.
>
> Compelling a person to subsidize the speech of other private speakers raises similar First Amendment concerns. As Jefferson famously put it, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical."

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018) (citations omitted).

Even before *Janus*, it was long established that a "'significant impingement on First Amendment rights occurs when public employees are required to provide financial support for a union that 'takes many positions during collective bargaining that have powerful political and civic consequences.'"  *Janus*, 138 S. Ct. at 2464 (citations omitted).  Here, plaintiffs are required to provide financial support for a school system that has misused public resources to seek "powerful political and civil consequences" through conduct inconsistent with its statutory missions.

Most importantly, *Janus* forcefully required that test of at least "exacting scrutiny" must be used for judicial review, under which "a compelled subsidy must 'serve a *compelling state interest* that cannot be achieved through means significantly less restrictive of associational freedoms'".  *Id.* at 2465 (emphasis added; suggesting that "strict scrutiny" may be appropriate); *see also id.* at 2480 (noting previous excessive deference by federal courts).  *Janus* also recognized that cases like this, involving large numbers of private speakers with potentially more

serious impact on governmental decisions, require stricter First Amendment analysis. *See id.* at 2473.

After *Janus*, the Ninth Circuit's "intermediate level" scrutiny assessing only whether "interference with First Amendment rights imposed on those objecting to the expenditures" are 'adequately supported by a governmental interest,'" *Rounds,* 166 F.3d at 1037, is no longer the operative rule and, as a matter of law, cannot be relied upon by this Court. Prior precedent must also be reviewed in light of the Supreme Court's reaffirmed insistence on compelling reasons to interfere with First Amendment rights.

Thus, it is not nearly enough for PPS to show speech "connected" to a "legitimate government purpose". (*Cf.* Dft. Mtn. 19 (misusing *Johanns*); *see also id.* at 15 (asserting "legitimate government purpose—seeking to increase safety and reduce gun violence in Oregon's public schools")). Such a facile but constitutionally-unsound argument could be asserted in support of any political or ideological issue and is flatly inconsistent with *Janus*. No compelling state interest authorizes mobilizing crowds of students to demand legislative action restricting the fundamental civil rights of plaintiffs and others under the Second Amendment. (¶ 15.)

Oregon law provides numerous specific statutory means for addressing school safety involving guns (*e.g.*, Chap. 93, Or. Laws 2014, §§ 1-2, ORS 339.312, 339.215, ORS 339.331), none of which contemplate mobilizing mobs of students. It is sheer speculation to suggest that encouraging students to violate PPS policy and behave in disorderly ways to demand gun control has any positive impact on school safety. Plaintiffs allege the contrary is the case. (¶¶ 11-14; *see also* ¶ 60.)

Nor does PPS demonstrate how any interests in promoting gun control could not be

adequately vindicated by means such as its Board resolution (¶ 50), lobbying local politicians

(¶¶ 51-52, 54), other action by its own officers and employees, or implementation of the statutes

cited above.  The specific steps PPS lists to address school shootings on the last page of its

motion—to "plan for the possibility of such violence, coordinate with law enforcement, and

secure their buildings from intruders" and "identify and work with students showing warning

signs for depression and violence"—have nothing to do with gun control.  (Dfts. Mtn. 19.)  What

crossed the line here was the mobilization of private citizens in mass demonstrations.

In general, there is no "compelling state interest" in subsidizing such private speech on

one side of highly-controversial political issues.  PPS asserts the right to allow schools to become

factories for generating mass support for the political preferences of school leaders, "train[ing]

students to react emotionally based on one-sided propaganda and act out in violation of the rules

and norms established by representative government" (¶ 72).

As the Ninth Circuit has explained, "the Nation's future depends upon leaders trained

through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude

of tongues, (rather) than through any kind of authoritative selection.'"  *Rounds*, 166 F.3d at

1038-39 (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)).  While this Court

may eschew wading deeply into the classrooms where PPS is laying waste to the future by

shutting down any "robust exchange of ideas," it can and should draw a line that at least keeps

the children in class.  Such a holding will not limit any reasonable lawful educational activities

by PPS.

## III.  THE FIRST AMENDMENT PROHIBITED PPS FROM COMPELLING PLAINTIFFS TO PAY FOR STUDENT DEMONSTRATIONS.

This case may be unprecedented, but it is unprecedented because PPS' conduct is

unprecedented.  Under the new standard of review required by *Janus* and longstanding

interpretations of the First Amendment, PPS's mobilization of private actors to carry partisan political messages cannot be upheld as "government speech".

*Keller* and *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209 (1977), established that "bar [association] or union speech on political matters was not germane to the regulatory interests that justified compelled membership, and accordingly, making those who disagreed with it pay for it violated the First Amendment". *Johanns*, 544 U.S. at 558. Initially, the core concern was precisely what motivates this case: "preventing compulsory subsidization of ideological activity". *Abood*, 431 U.S. at 237. *Janus* went further, holding that even "speech that is germane to collective bargaining" inherently addressed matters of public concern that made a compelled subsidy unconstitutional. *Janus*, 138 S. Ct. at 2373.

PPS, like the bar association in *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990), possesses "specialized characteristics" which serve "to distinguish it from the role of the typical government official or agency". *Keller*, 496 U.S. at 12. It was not created to "participate in the general government of the state". *Id.* at 13.

Just as the Bar could not "fund activities of an ideological nature which fall outside" of "the State's interest in regulating the legal profession and improving the quality of legal services," *id.* at 14, 13, so too may PPS not fund activities outside the State's interest, defined and limited by the statutes, regulation and policies discussed above, in educating primary and secondary school students. Nothing in *Johanns* purported to insulate "government speech" not germane to the government entity's lawful mission from scrutiny under the First Amendment.

In *Mountain States Legal Foundation v. Denver School Dist.*, 459 F. Supp. 357, 359 (D. Colo. 1978), the court was asked to enjoin a school district's decision to use "equipment, materials, facilities, funds and employees" (*id.* at 358 (quoting Board resolution)) in opposition

to a citizen initiative to amend the Colorado Constitution.  The school district's primary defense

was that Colorado law authorized a school board to make "contributions or contributions in kind

in campaigns involving only issues in which they have an official concern".  *Id.* at 359 (quoting

statute).  The *Denver* court held that the school district's activities violated the First Amendment

rights of Denver citizens, explaining that "use of the power of publicly owned resources to

propagandize against a proposal made and supported by a significant number of those who were

taxed to pay for such resources is an abridgment of those fundamental freedoms".  *Id.* at 360-61.

The *Denver* court's discussion of the school district's attempt to relate the political

activity to its mission is instructive:

> "The characterization of a campaign issue as being of official concern is not a judgment which can be made solely by the board of education. Such an interpretation would give unlimited discretion to the school board to use school funds and school facilities whenever it suited the personal preference of the majority of the members.

> "What is of 'official concern' to a school district board of education is to be determined by reference to the official powers and duties delegated by the general assembly in the school laws."

*Id.*  The *Denver* court acknowledged that the citizen initiative "would affect the conduct of the

affairs of school districts," but found the constitutional issues be beyond the purview of the

district—as distinguished, for example, from, "voting on a school bond issue".  *Id.* at 359.

PPS' promotion of the effective disarmament of American citizens, contrary to the pro-

Second Amendment position "supported by a significant number of those who were taxed to pay

for such resources" (*id.* at 360-61), raises constitutional issues of a magnitude far greater than the

Colorado initiative.  As in the *Denver* case, the scope of Second Amendment rights is of concern

to the People, not PPS officials exercising limited authority under Oregon law.[4]

---

[4] The *Denver* case may have preceded the rise of the "government speech" doctrine, but the "germaneness" requirement has always been a component of that doctrine.

The *Keller* Court characterized identifying the scope of prohibited activities as "difficult" (*id.* at 14), but it should be easier in the wake of *Janus*. This case is not difficult because *Keller* held that "the extreme ends of the spectrum are clear: Compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative." (*Id.* at 16-17.) The Bar association was not permitted to argue that gun control would have a positive effect on business in the California courts by reducing backlogs in clogged criminal courts, or otherwise "improve the administration of justice" (*Keller*, 496 U.S. at 5 (quoting State Bar mission).) Neither can PPS argue that gun control will somehow assist its educational missions.

A.   **The Speech Here Was Not "Government Speech" Beyond First Amendment Review.**

PPS depends solely upon its bald claim that the demonstrations by students (and invited third parties) constitute "government speech" entirely insulated from First Amendment challenge. Specifically, PPS argues that whenever a government agency "embarks on a course of action," it need not "maintain viewpoint neutrality when its officers and employees speak about that venture". (Dfts. Mtn. 11 (citing *Matal v. Tam*, 137 S. Ct. 1744 (2017)). Again, producing multiple crowds of students chanting "Hey ho, hey ho, the NRA has got to go" (¶ 58) is not speech germane to sort of educational venture PPS may conduct under Oregon law and ordinary American practice.

In *Matal,* the Supreme Court reviewed the Trademark Office's refusal to allow registration of "The Slants" as disparaging but declined to hold the issuance of a trademark as "government speech" exempt from a First Amendment challenge for refusing the register the rock band's chosen name. *Id.* at 1758. The case is an admonition from the Supreme Court that "we must exercise great caution before extending our government-speech precedents". *Id.* *Matal* warns that "[i]f private speech could be passed off as government speech by simply

affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.*[5] To characterize student demonstrations organized by PPS for the express purpose of overpowering the disfavored viewpoint of plaintiffs as "government speech" is the sort of "dangerous misuse" of the doctrine *Matal* warns against. *Id.*

PPS attempts to set up a straw man by arguing that *Keller* rejected a grossly general First Amendment right to object to the speech of those "paid by public funds" (Dfts. Mtn. 11) when it held that "[i]f every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed". *Keller*, 496 U.S. at 12-13. Plaintiffs seek no such broad ruling, only an extension of *Keller* to the to the specific and unprecedented student demonstrations challenged here. The speech in *Keller* was speech by a governmental entity, but no "government speech" doctrine barred the grant of relief when the government entity strayed beyond its mission to misappropriate payments compelled from citizens to advance partisan political objectives. Beyond that fatal defect in PPS' "government speech" defense are several others.

### 1.  Students are private actors, not government speakers.

*Keller* explained the core of the "government speech" exception to the First Amendment's limits on compelled subsidization of speech:

"Government officials are expected as a part of the democratic process to represent and to

---

[5] It is axiomatic that "in the realm of private speech or expression, government regulation may not favor one speaker over another". *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Notwithstanding claims of potential interference with educational choices in allocating resources, the Supreme Court did not hesitate in *Rosenberger* to strike down a university decision to fund some private speech while disfavoring other (religious) speech. This decision followed earlier precedent striking down New York's refusal to make educational facilities available to religious groups. *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384 (1993).

espouse the views of a majority of their constituents.  With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free *to speak for themselves* in the process."

*Keller*, 496 U.S. at 12-13 (emphasis added).  Again, the Portland School Board members are not

the officials "charged with making governmental decisions" concerning the scope of the Second

Amendment.

The intent of the "government speech" exception to the rule against compelled

subsidization is that PPS officials, paid by PPS, must be free to speak "for themselves" to

advance the policies of PPS.  It was never intended to permit PPS officials to hijack public

resources to promote the speech of others, specifically students and activist groups mobilizing

them at public expense, to change the policies of other government entities.

Plaintiffs' allegations that the students were indoctrinated into participating in the

demonstrations must be taken as true on this motion, but whether or not indoctrinated into

participation, the protesting students were unquestionably private citizens.  PPS is "responsible

for educating children" (ORS 332.072), who are not as a matter of law the agents of PPS.  Frank

admissions by individuals such as Board Member Rita Moore that she wanted to "capture the

energy" of PPS students for political purposes (¶ 35) do not amount to making the students

government agents—it was *the students'* energetic speech she wanted to exploit.

In analogous contexts involving litigation over student activity fees, the Supreme Court

has never doubted that what is involved is "student speech".  *E.g., Bd. of Regents v. Southworth*,

529 U.S. 217, 220 (2000) (allowing only viewpoint-neutral subsidization of student activities).

Cases striking down student activity fees that are not distributed in a viewpoint neutral manner,

while informative, involve a far less direct constitutional violation than the conduct challenged

here; the student "has only to fund a distributing agency having itself no social, political or

ideological character and itself engaging . . . in no expression of any distinct message".
*Southworth*, 529 U.S. at 240 (Souter, J., concurring).

PPS nevertheless suggests that it was simply and properly carrying out government speech "through non-governmental third parties" and engaged in no more than the "'compilation of the speech of third parties'". (Dft. Mtn. 15 (citing *Arkansas Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).) What happened here cannot remotely be characterized as mere "compilation," or analogized to some neutral editorial effort like the *Arkansas* case, which allowed a public broadcaster to exclude a fringe candidate from a televised debate.

Plaintiffs recognize that the *Arkansas* court did draw an analogy to "a public school prescribing its curriculum, [which] by its nature will facilitate the expression of some viewpoints rather than others". *Id.* But plaintiffs are not challenging lawfully-adopted curriculum; they challenge massive support for massive demonstrations PPS claimed was "students express[ing] *their* understanding of the Constitution [and] advocat[ing] for safe schools and common sense gun control" (¶ 44; emphasis added), organized and promoted by PPS with the purpose of manipulating Oregon's political system. Courts are especially protective of First Amendment values where, as here, school officials "attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom". *Board of Education v. Pico*, 457 U.S. 853, 869 (1982) (plurality opinion).

PPS claims this case is "controlled" by *Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir. 2000). *Downs* merely rejected a teacher's claim that the District had violated his First Amendment rights by forbidding him from placing anti-homosexual matters on a bulletin board. That case merely stands for the proposition that PPS might regulate *its own teachers' speech*—the speech of its own agents presenting a government message. PPS cannot

use the case to turn private student speakers into government actors. Plaintiffs do not deny that

PPS intentionally influenced what students said and did, but at all relevant times, PPS insisted

that the actions should be attributed to the students.

### 2. Lawless conduct cannot be government speech.

Even if the students are to be regarded as no more than agents under the full control of

PPS, "the involvement of public officials in advocacy may be limited by law, regulation, or

practice." *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009); *see also Walker v. Texas*

*Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2246 (2015) ("statutory

provisions . . . may limit government speech"). Simply put, illegal government conduct, or even

extraordinary government conduct far beyond any normal "practice," cannot constitute protected

"government speech" for purposes of First Amendment analysis. Put another way, the

unlawfulness of the conduct challenged herein means that it cannot be regarded as "germane" to

PPS' mission as a matter of law.

Here, PPS' unlawful conduct was *founded* on "exploiting professional relationships with

any student . . . in support of persons or issues" in violation of OAR 582-020-0035(1)(b). PPS

violated federal and Oregon law protecting student privacy to advance its scheme as well. (*See*

¶ 27.) More importantly, PPS' scheme was also founded on wholesale evasion of requirements

that students "regularly attend a public full-time school during the entire school term" (ORS

339.010).[6]

PPS' decision to excuse absences, declaring in advance that no one would be punished

---

[6] Required attendance is emphasized in Oregon law, which provides only specific limitations on excused absences that do not include large-scale support of political demonstrations (ORS 339.065(2); *see also* OAR 581-021-0046 (excuses for religious beliefs)). Oregon goes so far as to create formal attendance supervisors to investigate any "truancy or unexcused absence" (ORS 339.055; *see also* OAR 581-021-0077 (compulsory attendance notices)).

for leaving school grounds (¶ 84), and even creating special protest periods (¶ 45)—all in violation of its own formal policies and Chapter 339 ORS and the Education Department Regulations (*see* ¶¶ 81, 83)—were illegal attempts to evade its statutory and regulatory obligations to keep children in class. That is presumably why, until now, PPS has so strenuously denied its actual organization of the demonstrations.

Even the subject matter of the protest ran afoul of Oregon law, which required PPS to give "special emphasis . . . to instruction in… obedience to law, respect for the national flag, the Constitution of the United States and the Constitution of the State of Oregon . . . " ORS 336.067(1)(a). Instead, PPS evaded all procedural requirements for adopting curriculum (*e.g.*, ORS 337.120 & OAR 581-022-2350), which required defendants to engage in procedures for public involvement by citizens whenever instructional materials were to be utilized in addition to those previously approved by the State Board of Education (¶ 63). PPS thereby employed unapproved curriculum written by anti-gun activists claiming, in substance, that the Constitution and Second Amendment were simply obsolete (¶ 81). PPS's teaching of disregard for the Constitution and the rule of law cannot be protected "government speech".[7]

### 3. PPS' improper motives support plaintiff's First Amendment claim.

Here, plaintiffs plead a detailed case from which it is obvious that PPS officials had a powerful motive to further their own ideological biases. The Supreme Court has repeatedly held that otherwise permissible government action may nonetheless be struck down on First Amendment grounds where the action is driven by an improper, viewpoint-based motivation. *See, e.g., Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 812-813 (1985)

---

[7] Further evidence that encouraging mass demonstrations is not protected "government speech" is found in legal requirements that students must "conduct themselves in an orderly fashion" and avoid "disruption of the school". OAR 581-021-0055. The conduct created by PPS, with students "running wildly and unsupervised in the streets" (¶ 47) cannot be so characterized.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

(remanding for determination whether exclusion of entities from fundraising drive was "impermissibly motivated by a desire to suppress a particular point of view"). The *Pico* line of cases (involving school libraries) also illustrates the importance of assessing motive.

In *ACLU of Florida, Inc. v. Miami-Dade County School Board,* 557 F.3d 1177 (11th Cir. 2009), the Court declared that "if the Board removed the book [from a school library] simply because it disliked the ideas contained in it and by removal of the book sought to prescribe political orthodoxy or other matters of opinion . . . , then the Board violated the plaintiffs' First Amendment rights. *Id.* at 1206 (citation omitted). Accordingly, "the core constitutional facts . . . involve the reasons the School Board took the challenged action". *Id.*; *see also id.* at 1227 (motive is the "real issue"). Relying upon *Pico*, the 11th Circuit concluded that it was constitutionally required to "determine 'the decisive factor' that motivated the Board". *Id.* at 1207.

Plaintiffs do not generally challenge "how and what [PPS's] teachers are to teach" (Dfts. Mtn. 11); plaintiffs plead references to the use of unauthorized anti-gun curricula, adopted in violation of Oregon law, to highlight that it was not "government speech" involved here, but private political activism conducted by misusing government resources. But even "government speech," including the selection of curriculum, may be restrained if motive sufficiently hostile to First Amendment values is found. The question whether and to what extent PPS' conduct reaches that level is intensely factual; to deny PPS' motion, the Court must merely find the fomenting of mass private demonstrations crosses the boundary of constitutionally-permitted conduct.

It has long been the law that "state-operated schools may not be enclaves of totalitarianism" with students "regarded as closed-circuit recipients of only that which the State

chooses to communicate," *Tinker v. Des Moines Indep. Cmty. School Dist.*, 393 U.S. 503, 511-12 (1969); *see also Pratt v. Independent School Dist.,* 670 F.2d 771, 776 (8th Cir. 1982) (the First Amendment precludes local authorities from imposing a "pall of orthodoxy" on classroom instruction which implicates the state in the propagation of a particular . . . ideological viewpoint). That is precisely what happened here. (*See also* ¶¶ 43, 50, 53 59 (no contrary points of view presented).)

Plaintiffs can and will demonstrate at trial that the PPS Administration took the actions it took not from any educational mission, but to advance the personal agendas of those in control of PPS. The radical nature of PPS' anti-gun position cannot be understated (¶ 50), and the extensive involvement of third-party political activist entities and politicians further underscores the partisan political nature of the enterprise. (*E.g.*, ¶¶ 24, 26, 27, 31, 51-52, 54 & 59.)

**B.     PPS' Conduct Undermines the Most Fundamental Purposes of the First Amendment.**

The "government speech" exception is predicated on the assumption that "traditional political controls to ensure responsible government action would be sufficient to overcome First Amendment objections . . .". *Bd. of Regents v. Southworth*, 529 U.S. 217, 229 (2000). That is not the case here, because as alleged in great detail (¶¶ 18-21, 65-66 & 70-71), plaintiffs suffer the sort of "prejudice against discrete and insular minorities" which is a "special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry . . . ". *United States v. Carolene Products Co.,* 304 U.S. 144 (1938); *see also* J. Blocher, *Viewpoint Neutrality and Government Speech*, 52 B.C. Law Rev. 695, 709 (2011) (discussing the inadequacy of the political remedy).

As the California Supreme Court has explained, in the course of holding that the State

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Parks Department could not expend funds to support a bond issue for public parks,

> ". . . such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests *or bestow an unfair advantage on one of several competing factions*. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office (*see, e.g.*, Madison, *The Federalist Papers*, Nos. 52, 53; 10 Richardson, *Messages and Papers of the Presidents* (1899) pp. 98-99 (President Jefferson)) . . ."

*Stanson v. Mott*, 17 Cal. 3d 206, 217 (1976) (emphasis added). Thus, courts are especially attentive to compelled subsidization schemes which "enhance the power of one, and only one, ideological group to further its political goals". *Cf. Kania v. Fordham*, 702 F.2d 475, 480 (4th Cir. 1983) ("the University's imposition of student fees is not designed to further the University's ideological biases, but instead to support an independent student newspaper").

PPS misses much of the offensiveness of its conduct to the First Amendment by focusing exclusively on "harm to any particular individual's associational rights". (Dft. Mtn. 2.) A precedent upholding PPS' conduct here threatens the "marketplace of ideas" and the very institutions in which the political discourse takes place. *These* are the core objects of First Amendment protection, for when "'a government can manipulate [the] marketplace, it can ultimately subvert the processes by which the people hold it accountable.'" G. Klass, *The Very Idea of a First Amendment Right Against Compelled Subsidization*, 38 U.C. Davis L. Reb. 1087, 1129-30 (2005) (citation omitted). Simply put, PPS sought to "'falsify [public] consent [to gun control] by creating a [apparent] majority will through uncontrolled indoctrination activities'". *Id.* at 1130 n.159 (citation omitted).

PPS' assertion of the power to "educate" entire generations of Portland schoolchildren in an extraordinary fashion that trains them to engage in mob action and despise and attack conservative political views should invoke this Court's strictest scrutiny. Mobilizing mass

demonstrations outside the classroom in support of one side of a controversial political issue is clearly over the constitutional line. Granting PPS' motion to dismiss would foster extraordinary conduct that threatens the Constitution itself. It would establish a rule of law where the Nation's primary and secondary schools are pressed into the service of other partisan battles, paving the way, for example, for school districts outside of Portland to foster demonstrations with children chanting "Hey ho, hey ho, *Roe v. Wade* has got to go".

### C. PPS's Attempts to Invent Further Limitations on the Doctrine Prohibiting Compulsory Subsidization Should Be Rejected.

#### 1. Cash payments to private parties are not required to prove plaintiffs' claims.

PPS claims that all First Amendment precedents concerning compulsory subsidization involved only compelled payments "to a private party," but state-mandated, integrated bar associations are not private parties. *See Keller*, 496 U.S. at 11; *see also Gruber v. Oregon State Bar*, No. 3:18-cv-1591-JR (D. Or. April 1, 2019) (extensive analysis of 11th Amendment immunity of state bar), *appeal pending*. Nor are public universities private parties. PPS also argues (at 16) that the compelled subsidization of speech can only be offensive where cash is paid directly to private speakers, such that the provision of millions of dollars' worth of services and facilities would be immune from review. The *Mountain States* case is to the contrary, involving use of school facilities (*Mountain States*, 459 F. Supp. at 358), and the threats to First Amendment values described above arise whether or not cash is involved.

PPS cites *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47 (2006), but that case involved whether Congress had the power, *as a condition of federal funding*, to compel schools receiving funds to provide military recruiters access to students equal in quality and scope to that provided to other recruiters. *Rumsfeld*, 547 U.S. at 51. Judicial

deference was "at its apogee" given "broad and sweeping" power to "raise and support Armies". *Id.* at 58 (citations omitted). That power allowed Congress to directly impose an access requirement, removing any claim of an unconstitutional condition to accepting the funds. *Id.* at 59-60.

PPS therefore cites a footnote in *Rumsfeld* in which the Court noted that the military recruiting was also "government speech," as to which no claim of unconstitutional subsidization could be made, noting that "[t]he accommodations the law schools must provide to military recruiters are minimal, are not of a monetary nature, and are extended to all employers recruiting on campus, not just the Government". *Id.* at 61 n.4. *Rumsfeld* cannot be read to reject plaintiff's theory of Count 1 or establish any categorical rule concerning compelled subsidization of private speech involving very significant non-monetary support (as well as viewpoint discrimination).

> ### 2. Plaintiffs need not prove they will be personally identified with the groups of demonstrating students.

PPS also asserts that there can be no compelled subsidization unless complaining private parties are closely linked with the challenged expression "in a way that makes them appear to support the government message". (Dft. Mtn. 17 (citing *Doe v. Congress of United States*, 891 F.3d 578 (6th Cir. 2018)). The *Doe* case involved a challenge to the use of "In God We Trust" on U.S. currency. This was quintessential "government speech," and the cited discussion (at 593) involved whether using currency was compelled speech, not subsidized speech.

PPS cites no case, and plaintiffs are aware of none, where a compelled subsidy claim has been rejected on the basis that there is no harm in forcing a citizen to fund a message if he is not personally associated with it. In the wake of *Janus*, no such holding is possible. *Johanns* and *Glickman v. Wileman Bros. & Elliot, Inc.,* 521 U.S. 457 (1997), concerning subsidization of commercial speech (with substantially lesser First Amendment restrictions than the controversial

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

political speech at issue here) do not involve an associational requirement; *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980), was premised on special state constitutional provisions absent here (*id.* at 81).

**3.    That the payments are made through local taxes does not excuse the conduct.**

PPS also argues that plaintiffs cannot challenge its conduct by virtue of paying taxes to support it (and lack standing to do so) under *Massachusetts v. Mellon*, 262 U.S. 447 (1923). That case was substantially abrogated by *Flast v. Cohen*, 392 U.S. 83 (1968), which found "no absolute bar in Article III to suits by federal taxpayers challenging allegedly unconstitutional federal taxing and spending programs".

More importantly, the doctrine never had any application in cases concerning *local* taxes. *Mellon*, 262 U.S. at 486. Federal courts considering First Amendment Claims based on compelled speech through subsidization have thus expressly rejected the notion that because taxes were involved, no such claim could be made. *E.g., Alabama Libertarian Party v. Birmingham*, 694 F. Supp. 814, 815-16 (N.D. Ala. 1988) (citing *Mellon*'s exclusion of local taxes). While it is true that the *Alabama Libertarian Party* court declined to grant relief, it was because the political issue concerned bonding for better 911 service, which the court found was "not political or ideological in nature". *Id.* at 817.[8]

Ironically, the very ground urged for judicial review in *Flast*—that "religious liberty ultimately would be the victim if government could employ its taxing and spending powers to aid one religion over another . . ." (*Flast*, 392 U.S. at 103-04) applies *a fortiori* here. Again, if there is no constitutional constraint on government entities re-directing tax resources to assist

---

[8] Plaintiffs note that in Oregon, taxpayers have always been permitted to sue for misuse of public funds. *E.g., Carman v. Woodruff*, 10 Or. 133 (1882); *Comeaux v. WWID*, 315 Or. 562 (1992).

groups determined fundamentally to alter the balance of power between citizens and their government, all liberty may be lost (¶¶ 16-17).

No "deluge of litigation" will result from allowing local taxpayers to stop the extraordinary and unlawful practice of shutting down entire schools to mobilize mobs of children in the streets to pursue highly-controversial political and ideological objectives. (*Cf.* Dfts. Mtn. 18.) Proper application of the "government speech" doctrine prevents every hypothetical cited by PPS.

## IV. THE FIRST AMENDMENT FORBIDS PPS' COMPULSION TO SUPPORT GUN CONTROL PROTESTS.

In *Janus*, the Supreme Court significantly expanded decades of precedent confirming a fundamental First Amendment right to "eschew association for expressive purposes". *Id.* at 2463. Even prior to that, it has long been the law that " . . . where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message". *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

PPS's conduct fails as a matter of law under the "strict" or "exact scrutiny" required under *Janus*, because there is no "legitimate governmental interest in requiring the publication or affirmation of positions with which the bearer or speaker d[oes] not agree," *Southworth*, 529 U.S. at 242 (Souter, J., concurring), much less a compelling government interest. After *Janus*, there is no excuse for any effort by PPS to make its students carriers of the PPS' political messages.

Thus, PPS relies on an attempt to dispute the factual degree of compulsion alleged, a question not properly resolved on a Rule 12(b)(6) motion. There is little doubt that the special education student turned into a sign carrier was required to act as a courier for PPS' ideological

message, as he or she lacked capacity to understand the action.  (¶ 49.)  He stood in the position of New Hampshire license holders unconstitutionally compelled to display the "Live Free or Die" message in *Wooley*, 430 U.S. at 715.

But all other students were subject to a highly coercive atmosphere as well, and particularly in the primary or secondary school context, courts interpreting the First Amendment have taken care not to insist upon formal punishment for non-participation.  In reviewing the degree of compulsion, it is important to recognize that students are in a "school environment where . . . subtle coercive pressures exist and where the student[s] ha[ve] no real alternative which would have allowed [them] to avoid the fact or appearance of participation".  *Lee v. Weisman*, 505 U.S. 577, 588 (1992).  *Lee* recognized that students "are often susceptible to pressure from their peers toward conformity" and held that "the government may no more use social pressure to enforce orthodoxy than it may use more direct means".  *Id.* at 593-94.

The *Lee* case involved a student's *voluntary* attendance at a school graduation ceremony (*id.* at 583), forbidding clergy participation as a violation of the First Amendment's Establishment Clause.  Just as that clause "guarantees that government may not coerce anyone to support or participate in religion" (*id*. at 587), so too does the First Amendment generally forbid government from coercing participation in demonstrations seeking to limit fundamental constitutional rights of American citizens.

PPS's conduct went beyond any ordinary social pressure or pressure.  PPS subjected students to weeks of emotional manipulation, sitting through "community circles," acting out the role of shooting victims, poster and letter-writing campaigns, and mass demonstrations.  (*See generally* ¶¶ 64-71.)  The success of this strategy is evidenced by contemporaneous student reports that "any conservative point of view is . . . despised".  (¶ 66.)  While there may be no formal

punishment of dissenting students by school officials, those officials established and tolerated an environment where students "have been subjected to severe bullying, intimidation and ostracism with other students cursing them, attacking them on social media.  (¶ 70; *see also* ¶ 71 (school tolerates students telling conservative club:  "Nazi Punks F**k Off").)  Some teachers have gone beyond tolerating student attacks to direct intimidation themselves.  (¶ 70.)

Evidence at trial will further demonstrate that owing to the special "protest period," the normal classrooms were locked and/or unattended by teachers, and students had in many cases literally no place to go but to the protests.   Like the graduation ceremony in *Lee*, students were "for all practical purposes, obliged to attend".  *Id.* at 589.  As in *Lee*, the protests "bore the imprints of the State and thus put school-age children who objected in an untenable position".  *Id.* at 590.

Ultimately, "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools" (*id.* at 592) are just as applicable to students opposed to anti-Second Amendment advocacy as they are to atheists.  Plaintiff Schow and others "had a reasonable perception that they were being forced to [protest]" resulting in real injury, and any "reasonable dissenter in this milieu could believe that the group exercise signified her own participation or approval of it".  *Id.* at 593.

The only compelled speech case cited by PPS involving students, *C.N. v. Ridgewood Board of Education*, 430 F.3d 159 (3d Cir. 2005), concerned participation in a confidential survey as to which all of the foregoing elements were absent.  PPS's remaining cases are no more helpful.   Plaintiffs plead far more than the compulsion that was "minimal" or "wholly subjective" in *Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (concerning a Board resolution censuring one of its (adult) members for public

opposition to a tax increase). Plaintiffs plead far more than the chilling effect asserted in *Laird v. Tatum*, 408 U.S.1 (1972), "allegedly caused, not by any 'specific action of the Army against them, [but] only [by] the existence and operation of the intelligence gathering and distributing system, which is confined to the Army and related civilian investigative agencies'". *Id.* at 3 (quoting Court of Appeals).

The coercive climate in Portland schools engineered by PPS to propel students in the streets of Portland is a clear step toward the "enclaves of totalitarianism" the Supreme Court warned of in *Tinker*. The annals of history and literature are rich with examples of just how far governments can go to utilize students to advance political and ideological objectives in nations without constitutional limits to circumscribe their conduct.

### Conclusion

For the foregoing reasons, PPS' motion to dismiss should be denied.

DATED: June 17, 2019.

MURPHY & BUCHAL LLP

*s/ James L. Buchal*
James L. Buchal, OSB No. 921618
3425 S.E. Yamhill Street, Suite 100
Portland, OR 97214
Tel: 503-227-1011
Fax: 503-573-1939
jbuchal@mbllp.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing PLAINTIFFS' MEMORANDUM IN

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS on June 17, 2019, by notice of

electronic filing using the CM/ECF System and by First Class mail on the following party listed

below:

Liz Large, Interim General Counsel
501 N. Dixon Street
Portland, OR  97227
Tel:  503-916-3570
E-mail:  llarge@pps.net
*Attorney for Defendants*

*s/ Carole A. Caldwell*