William F. Gary, OSB #770325
william.f.gary@harrang.com
J. Aaron Landau, OSB #094135
aaron.landau@harrang.com
HARRANG LONG GARY RUDNICK P.C.
497 Oakway Road, Suite 380
Eugene, OR 97401-3273
Telephone:   541-485-0220
Facsimile:    541-686-6564
Of Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **LUCAS BURWELL, et al.,**<br><br>Plaintiffs,<br><br>vs.<br><br>**PORTLAND SCHOOL DISTRICT NO. 1J, et al.,**<br><br>Defendants. | Case No. 3:19-cv-00385-JR<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST CLAIM FOR RELIEF**<br><br>Pursuant to Fed.R.Civ.P. 12(b)(6)<br><br>Request for Oral Argument |

**1.     Introduction**

Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss doubles down on plaintiffs' already-incendiary rhetoric, now going so far as to allege that PPS is fostering "totalitarianism" and "laying waste to the future" such that, if PPS is not stopped, soon "all liberty may be lost." Resp. at 14, 29, 32.  What plaintiffs' Response does *not* do, however, is cure the legal deficiency that underlies their complaint: their allegations do not state any cognizable claim for violation of constitutional rights under 42 U.S.C. §1983.

That is true for two straightforward reasons.  First, plaintiffs fail to state a claim for "compelled speech" because they have not alleged facts showing that the government *compelled*

Page 1 –     **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

the student plaintiffs in this case to state a particular view—or indeed to say anything at all. And second, plaintiffs fail to state a claim for "compelled subsidization" because the only thing plaintiffs allege they were "compelled" to do is pay taxes. A state government may spend tax revenues in ways that do not accord with the personal or political views of one taxpayer or another—whether concerning gun control, health care, vaccinations, environmental policy, or any other issue regardless of how politically divisive it may be. A taxpayer has no constitutional right to prohibit the state from spending tax revenues in support of a view with which that taxpayer disagrees. Elected representatives and appointed public officials sometimes do and say things that run counter to our preferences or views. That is why we have elections—and that is why the First Amendment protects the right of individuals to speak out in disagreement with government policy. Plaintiffs' claim under §1983 therefore should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

**2.  Plaintiffs' "Compelled Speech" Claim**

To state a claim based on the theory of "compelled speech," a plaintiff must allege facts showing that:

    a. the government "compelled"—that is, forced—the plaintiff

    b. to engage in speech

    c. to which plaintiff objects, and

    d. that is readily associated with the plaintiff.

*See R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 917 (9th Cir. 2005) (the "compelled speech" doctrine means "the First Amendment does not permit the government to force citizens to express beliefs that are not their own."); *Doe 1 v. Marshall*, 357 F.Supp.3d 1310, 1324 (M.D. Ala. 2019) ("There is a four-part test. There must be (1) speech; (2) to which the plaintiff objects; (3) that is compelled; and (4) that is readily associated with the plaintiff.").

As noted in defendants' motion, "a violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion." *C.N. v. Ridgewood Bd. of*

*Educ.*, 430 F.3d 159, 189 (3d Cir. 2005). The requirement of "actual compulsion" means that "[i]n order to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *Phelan v. Laramie Cty. Comm. Coll. Bd.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (quoting *Laird v. Tatum*, 408 U.S. 1, 11, 92, S.Ct. 2318, 33 L.Ed.2d 154 (1972)). Accordingly, "in the absence of state mandated penalties coercing an individual to choose a course of conduct, state compulsion has not been found." *Wilkins v. Daniels*, 744 F.3d 409, 415 (6th Cir. 2014).

As a threshold matter, plaintiffs' complaint does not allege that any of the four student plaintiffs in this case were made to engage in any particular speech. Instead, the complaint broadly alleges that plaintiffs were made to "participate in the March 14th demonstrations and other anti-gun related activities[.]" Complaint ¶98.[1] What such "demonstrations" consisted of was not (and is not alleged to have been) uniform from one school to the next; what "other anti-gun related activities" includes is not clear; and what it means for these four plaintiffs to have "participated" is not specified. It is unclear whether these students marched, voiced a particular opinion, stood outside to watch, remained in their classrooms or in a cafeteria, or engaged in any other particular activity. Some of these actions would constitute "speech," while others would not. It is plaintiffs' burden to ensure the facts alleged are sufficient to show that plaintiffs were made to engage in such speech. Here, that burden is not met.

That failure to specify the alleged speech at issue has a second consequence. This court cannot conclude that plaintiffs have alleged facts adequately showing the element of government "compulsion" as to these four student plaintiffs, because the threshold question—compelled them *to do what?*—is one that the complaint leaves unanswered.

Even setting to the side that lack of specificity, and assuming that the student plaintiffs' "participation"—whatever it consisted of—constituted speech for purposes of the First

---

[1] All references to plaintiffs' complaint refer to the First Amended Complaint.

Page 3 –   **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

Amendment, plaintiffs' complaint still does not allege facts sufficient to show that the government "compelled" these four students to participate. Instead, plaintiffs allege that defendants' actions resulted in a "coercive atmosphere" of "social and peer pressure[.]" *Id.* at ¶97-98; Resp. at 30. As described in defendants' motion, the "atmosphere" plaintiffs describe does not constitute compulsion of the sort required for a compelled-speech claim.

Plaintiffs' Response, citing the school-prayer case of *Lee v. Weisman*, 505 U.S. 577, 588, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), urges this court "to recognize that students are in a school environment where subtle coercive pressures exist and where the students have no real alternative which would have allowed them to avoid the fact or appearance of participation." Resp. at 30. To begin with, the reason such "subtle coercive pressures" mattered in *Lee* is because *religious* acts by the government are governed by a different standard (under the Establishment Clause) than the one at issue here. Under that standard, the scope of actions that the government is prohibited from taking is much broader than just those that constitute "compulsion." Said another way, the plaintiff in an Establishment Clause action need not show that the government "compelled" the plaintiff to engage in the exercise of religion. The government can violate the constitution for having done far less than that—and *Lee v. Weisman* is a good example.

More to the point, the question in this case is not whether a school *could* conceivably compel student behavior using tacit or subtle means. Rather, the question in this case is whether plaintiffs' allegations are enough to show that the government *did* compel plaintiffs to engage in speech. The answer to that question is no.

In explaining how PPS accomplished such "compulsion," plaintiffs state:

> "In communications directly to students, PPS employees made it clear to students that participation in the March 14th anti-gun demonstrations was *all but required*. For example, the message read to students at Cleveland High School stated: 'Our role, as Cleveland teachers, administrators, and staff, is to support you to be safe while expressing your civil rights to make a stand during the national 'March for Our Lives' walkout scheduled for 10am on March 14th."

Page 4 –    **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

Complaint ¶67 (emphasis added); *see also* ¶64 (alleging that "[PPS' a]dvanced techniques … included widespread use of 'community circles to have students talk about school safety and having empathy for students that may be sad or hurt in our world'"); ¶68 (alleging that, by stating "We are proud of our students. Please know we stand with you," "defendants tell students they stand *against* students and others with opposing views, including advocates of Second Amendment rights.").

As a matter of law, for school employees to tell students that they stand with and support those students' efforts to advocate for school safety does not constitute the sort of regulatory, proscriptive, or punitive action necessary to show that the government "compelled" students to participate in particular expressive activity or to voice a particular view. *See* Defendants' Motion at 9.

Indeed, that is true of defendants' actions even as plaintiffs' complaint describes them. But the court need not (and should not) simply defer to plaintiffs' descriptions, as every one of plaintiffs' exhibits concerning communications from PPS and school administration make clear that no such "compulsion" occurred. Those exhibits are just as much a part of plaintiffs' pleading for purposes of Rule 12(b)(6) as their allegations are, and where those documents' contents contradict plaintiffs' allegations, the documents prevail—even for purposes of a motion to dismiss. *See* Fed. R. Civ. P. 10(c) (exhibits to a pleading are "a part of the pleading for all purposes"); *Coos County Board of County Com'rs v. Kempthorne*, 531 F.3d 792, 811 n14 (9th Cir. 2008) (affirming dismissal of plaintiff's claim; concluding that although plaintiff "did allege in its complaint" that defendant had made a particular decision, that decision "was attached to the complaint, and it simply does not say what [plaintiff] alleged; it says the opposite."); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (the court need not "accept as true allegations that contradict matters … [in an] exhibit" to the complaint); *see also Ott v. Home Savings & Loan Association*, 265 F.2d 643, 646 n1 (9th Cir. 1958) ("where the allegations of a pleading are inconsistent with the terms of a written contract attached as an exhibit," the terms of the exhibit "must prevail over" plaintiff's contrary allegations) (internal citation omitted).

As the complaint's own exhibits show, the student plaintiffs in this case were not "compelled" by the government to participate in the demonstrations at issue and were not compelled to express any particular message or view. Indeed, in the very same document that plaintiffs say "made it clear to students that participation in the March 14th anti-gun demonstrations was all but required," the school's administration expressly stated that students were *not* required to attend any such events, informing teachers that "[s]tudents can either 'walk out' with their peers, remain in the classroom, or go to the cafeteria if their teacher chooses to leave their classroom in order to support and supervise students during the walk out. We will also have faculty in their classrooms and in the cafeteria to help monitor and supervise our students." *Id.* at Ex. 27; *see also, e.g.*, Ex. 28 ("This is NOT mandatory and not everyone will choose to participate. Any student without a cleared permission slip will remain in class with their teacher."); Ex. 38 ("Students choosing not to participate may report to the cafeteria.").

Likewise, the Superintendent's directive to school principals *prohibited* elementary and middle school students from leaving school unless checked out by a guardian, and stated that "high school students who choose to walk out will receive an unexcused absence" from their school. *Id.* at Ex. 23. As for whether defendants mandated a particular message, the same memorandum directed school administration to "let students talk openly about the events in Florida, and about creating a safe and inclusive environment of all students" and to "allow students to express their individual views, but make sure there is room for divergent viewpoints" as well. *Id.* As for events outside the classroom, the memorandum suggested that schools permit such activities as "students and staff joining hands in a circle on the playground," "families joining students for a peaceful walk around the school grounds," or simply "17 minutes of silence." *Id.* Plaintiffs allege that those documents show PPS "compelled" students "to engage in mob action," Complaint at 25, but such allegations are flatly contradicted by the documents themselves.[2]

---

[2] Moreover, in the educational context (for instance, in a class discussion of materials with which plaintiffs disagree concerning the Second Amendment), even "compelled" speech does not

Page 6 –    **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

Plaintiffs' Response counters that, at the least, this court should find such "compulsion" occurred as to "the special education student turned into a sign carrier" who "was required to act as a courier for PPS' ideological message, as he or she lacked capacity to understand the action." Resp. at 30. Plaintiffs' argument refers to a child described at Paragraph 49 of plaintiffs' complaint, which in turn quotes a parent's comment posted to a community-discussion website. *See* Complaint ¶49, Ex. 27. That single internet comment does not make clear who the child in question is, where he or she attended school, where or when the described event occurred, what the alleged sign said, or what the underlying circumstances were.

Even if one were to set aside all such doubt and uncertainty, the comment described could not serve to support plaintiffs' claim because the child in question is not a plaintiff in this case. Plaintiffs have no standing to assert a constitutional claim based on the alleged violation of someone else's rights; they have standing only to assert a claim based on violation of their own rights. *See Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) (noting the "well-settled

---

violate the First Amendment so long as it serves a legitimate pedagogical purpose. As the Third Circuit has explained:

> First Amendment jurisprudence recognizes that the educational process itself may sometimes require a state actor to force a student to speak when the student would rather refrain. A student may also be forced to speak or write on a particular topic even though the student might prefer a different topic. And while a public educational institution may not demand that a student profess beliefs or views with which the student does not agree, a school may in some circumstances require a student to state the arguments that could be made in support of such beliefs or views.

*C.N.*, 430 F.3d at 187; *see also Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002) ("Plaintiff argues that he has a First Amendment right to draft [his assignment] from any viewpoint. To the contrary, [Supreme Court precedent] establish[es] that—consistent with the First Amendment—a teacher may require a student to write a paper from a particular viewpoint, even if it is a viewpoint with which the student disagrees, so long as the requirement serves a legitimate pedagogical purpose.") (citations omitted). Here, plaintiffs' complaint does not base their "compelled speech" claim on allegations that the four student plaintiffs were made to engage in such assignments or discussions, but it does broadly refer to participation in "anti-gun related activities." Complaint ¶98.

principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else.").

Plaintiffs respond that "PPS misses much of the offensiveness of its conduct to the First Amendment by focusing exclusively on 'harm to any particular *individual's* associational rights.'" Resp. at 25 (italics added). But that is what the law requires. This is not a class action; it is an action to redress alleged constitutional harms to the rights of four individual students and their parents. As to those individuals, the complaint does not allege facts sufficient to support a claim for "compelled speech" under the First Amendment.

### 3.    Plaintiffs' "Compelled Subsidization" Claim

A claim based on the theory of "compelled subsidization" is based on the same elements as a claim for "compelled speech," with the following distinction: the government is not alleged to have compelled the plaintiff to engage in speech, but rather to have compelled the plaintiff to pay for the speech of a non-government third party. *See Harris v. Quinn*, 573 U.S. 616, 656, 134 S.Ct. 2618, 189 L.Ed.2d 620 (2014) ("[N]o person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support."); *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 563, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005) (describing claim).

In this case, plaintiffs pursue a different theory. Plaintiffs do not allege that the government compelled them to pay money to a third party, but instead that the government required plaintiffs to pay their taxes—and that the government then used those tax revenues to support a position on gun control with which they disagree (in particular, by adopting a formal resolution advocating for congressional action on gun control, and by teaching students in ways that plaintiffs disagree with). *See* Complaint ¶93-95 ("In substance, defendants converted a portion of plaintiffs' local tax payments into forced contributions to political messages they oppose, and threaten to continue to do so. … Defendants' compulsory subsidization of ideological activity to which plaintiffs are opposed violated the First Amendment rights of plaintiffs…"); *see also* Ex.33 (PPS Resolution No. 5606, "Resolution on Gun Violence in Our Schools"). Plaintiffs' theory is that, having paid their taxes, plaintiffs have a constitutional right

Page 8 –    **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

to prohibit the government from spending that tax revenue in support of a view that they do not hold—because to do so would constitute "compelling" plaintiffs to "subsidize" that view.

That is not the law. The government is entitled to fund programs and to take positions that a taxpayer does not agree with. "Compelled support of government—even those programs of government one does not approve—is of course perfectly constitutional, as every taxpayer must attest." *Johanns*, 544 U.S. at 559. Stated another way, citizens "have no First Amendment right not to fund government speech." *Id.* at 563. And both of the subjects at issue here—a school district adopting a resolution advocating for congressional action on gun control, and that district's decisions about curriculum and classroom management—indisputably constitute "government speech." *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed. 2d 700 (1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker"); *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) (school curriculum is "government speech"); *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1011 (9th Cir. 2000) ("[this] is a case of the government itself speaking").

Plaintiffs argue that this court should follow the decision of *Mountain States Legal Foundation v. Denver School Dist.*, 459 F.Supp. 357 (D. Colo. 1978), which plaintiffs say took a contrary view when it concluded that a school district's use of public funds toward political advocacy violated the First Amendment. Resp. at 15-16. But as plaintiffs briefly acknowledge in a footnote, the *Mountain States* case "preceded the rise of the 'government speech' doctrine." *Id.* at n4. Thus, that case cannot be relied on for the principle that the First Amendment prohibits governmental entities from weighing in on issues of public concern. *See Kidwell v. City of Union*, 462 F.3d 620 (6th Cir. 2005) (declining to follow *Mountain States* because it was "decided before [the Supreme Court] clarified the extent to which governments do have the right to support their own positions on contested issues."); *Page v. Lexington Cty Sch. Dist. One*, 2007 WL 162178, at *12-13 (D. S.C., Jan. 17, 2007) (declining to follow *Mountain States* in part due

Page 9 –   **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

to its "failure … to address the recently developed government speech doctrine").  Subsequent cases have uniformly recognized that the principle of "government speech" permits a school district to weigh in on issues of public concern.  *See, e.g.*, *Downs*, 228 F.3d at 1014 (a school district is entitled "not only to talk about" such issues "but also to advocate" for one side or another).

Moreover, even if the *Mountain States* case had not been effectively superseded by the government-speech doctrine, that case did not involve a school district merely taking a public position or advocating for a particular result in Congress. It instead involved a school district telling its own residents how to vote in an upcoming election involving the school district itself. 459 F.Supp. at 358. The former is lawful. The latter is not – but is also not alleged here. *See also Page*, 2007 WL 162178, at *13 ("to the extent" cases like *Mountain States* can be said to limit political activity, "that limitation applies only in the context of an *issue pending before the voters*") (italics in original).

Next, plaintiffs' Response contends that they are suing over "private speech" and not "government speech" because "students are private actors, not government speakers."  Resp. at 18.  Of course students are not the government—and defendants have never argued otherwise. But plaintiffs are not suing students for what they did or said about the Second Amendment. They are suing the government for what *it* did and said about the Second Amendment. And what the government does and says about the Second Amendment is, by definition, government speech.

Plaintiffs next contend that this case should not be considered to involve "government speech" because "illegal government conduct…cannot constitute protected 'government speech' for purposes of First Amendment analysis."  Resp. at 21.  Plaintiffs cite no authority for the notion that "government speech" is subject to the First Amendment when the government itself is alleged to have broken the law, and defendants can find none.  The reason "government speech" is not subject to the First Amendment's free speech clause is because that clause simply does not govern what the government may and may not say.  Rather, it restricts the government

Page 10 –   **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

from prohibiting or compelling *citizens*' speech. *See Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460, 467, 129 S.Ct. 1125, 172 L.Ed. 2d 853 (2009) ("The Free Speech Clause restricts government regulation of private speech; *it does not regulate government speech*.") (italics added). That is not to suggest there are no restraints on what the government may say; for instance, federal statutes could restrict the FDA from publicly commenting on pending drug trials. But government speech, even when contrary to such statutes, remains "government speech" for purposes of the First Amendment.

Next, plaintiffs contend that even if defendants' actions would not otherwise violate plaintiffs' First Amendment rights, those actions still may be struck down as unconstitutional if the court finds that they were taken with "an improper, viewpoint-based motivation"—a conclusion that plaintiffs say is "obvious" from their allegations. Resp. at 22. Here, plaintiffs rely on cases standing for the principle that, where a plaintiff has asserted a claim for unconstitutional viewpoint discrimination, the court must consider whether the defendant's action was taken with an intent to discriminate based on viewpoint. *See* Resp. at 22-23. But plaintiffs in this case have not asserted a claim for unconstitutional viewpoint discrimination. *See* Complaint ¶90-100 (describing claim). Nor could they, because government speech is not subject to a requirement of viewpoint neutrality in the first place. *See Matal v. Tam*, -- U.S. --, 137 S.Ct. 1744, 1757, 198 L.Ed. 2d 366 (2017) (the Constitution does not "impos[e] a requirement of viewpoint-neutrality on government speech"; to do so "would be paralyzing."); *Chiras*, 432 F.3d at 614 ("[T]he selection of textbooks by the state for use in public school classrooms is government speech" and therefore "is not subject to [a] viewpoint neutrality requirement" under the First Amendment). Even if plaintiffs had attempted to allege a viewpoint neutrality claim, nothing prohibits a court from deciding whether a plaintiff has sufficiently alleged the requisite intent for such a claim for purposes of a motion to dismiss. Here, given the content of the exhibits on which plaintiffs rely (*see* above at 5-6), they have not.

Next, plaintiffs seek to cast doubt on defendants' case law by contending that "much of the precedent cited by PPS" in its Motion to Dismiss "must be re-examined" after the Supreme

Page 11 – **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

Court's recent decision in *Janus v. AFSCME Council 31*, -- U.S. --, 138 S.Ct. 2448, 201 L.Ed.2d 924 (2018). Resp. at 12-13. Plaintiffs contend that "[u]nder the new standard of review required by *Janus*," PPS' actions "cannot be upheld as 'government speech.'" *Id*. at 14-15. Contrary to plaintiffs' arguments, *Janus* had nothing at all to do with what constitutes "government speech"— the case does not discuss the subject or even mention the term. The question that *Janus* concerned was different: once it is established that the government has engaged in "compelled subsidization" of private speech, what standard of scrutiny must that government action survive in order to be upheld? *See Janus*, 138 S.Ct. at 2464-65 (describing question at issue). The court in *Janus* applied a standard of "exacting scrutiny," under which the compelled subsidy at issue must serve a "compelling" state interest that cannot be achieved through means significantly less restrictive of associational freedoms. *Id. Janus* does not bear on the question of "government speech" at all.

Moreover, defendants' motion did not overlook or fail to account for *Janus*. Defendants' motion acknowledged and discussed *Janus* as "the Supreme Court's most recent compelled-subsidization case," *see* Motion to Dismiss at 15; expressly noted that *Janus* had required, in the commercial-speech context, the showing of "a compelling government interest," *id.* at 19; and argued accordingly that PPS' interest in keeping public schools safe from acts of gun violence is undoubtedly a "compelling" interest. *Id.*

This is not a commercial-speech case, and whether *Janus*' "exacting" standard would apply here is not at all clear. In any event, which level of scrutiny would be appropriate to apply will be at issue in this case only if this court agrees with plaintiffs that they have been subjected to "compelled subsidization" of private speech in the first place. If the court does not reach that conclusion, then *Janus*' discussion of the appropriate level of scrutiny to apply has no effect at all on the case law that defendants have cited.

Plaintiffs nevertheless argue that defendants' conduct should be subject to an even higher standard. Citing Justice Stone's "Footnote Four" from *United States v. Carolene Products Co.*, 304 U.S. 144, 58 S.Ct.778, 82 L.Ed. 1234 (1938)—which set the groundwork for the concept of

"strict scrutiny" and led to a generation of civil rights cases under the Equal Protection Clause—plaintiffs contend that, as conservatives, they "suffer the sort of 'prejudice against discrete and insular minorities' which is a 'special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.'" Resp. at 24. Thus, they argue that this court should respond to perceived attacks on "conservative political views" with the "strictest scrutiny." *Id.* at 25.

It suffices to say that there is no Equal Protection Clause issue before this court—and in any event conservatives in America are not a "discrete and insular minority." Suspect classifications are limited to race, national origin, and other similar characteristics. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Such arguments do, however, help to illuminate the political grievance that underlies the complaint in this case. Much of plaintiffs' Response concerns not the "Walk-Out" that took place in March 2018, but a broader disagreement with the ways in which PPS' Board, administrators, and faculty manage Portland's schools and teach the community's children. Plaintiffs complain of PPS' "teaching of disregarding for the Constitution and the rule of law" and its adoption of "curriculum written by anti-gun activists claiming, in substance, that the Constitution and Second Amendment [are] simply obsolete." Resp. at 22. They contend that when PPS' teachers could have used class time to emphasize "instruction in obedience to law" and "respect for the national flag," teachers instead had students "sit in circles talking about their feelings about school shootings." *Id.* at 8, 22. And plaintiffs complain that when PPS could have required students to "conduct themselves in an orderly fashion" and "avoid disruption of the school," *id.* at 22, they have instead allowed students to "behave in disorderly ways" and to run "wildly and unsupervised in the streets." *Id.* at 10, 13. Plaintiffs urge that, at the least, this court "can and should draw a line that at least keeps the children in class." *Id.* at 14.

Page 13 –   **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

Plaintiffs are certainly entitled to raise such concerns at public meetings, in school conferences, and at the ballot box. But such concerns do not constitute a claim for violation of First Amendment rights. Because plaintiffs' complaint fails to state a cognizable claim for violation for the First Amendment, that claim should be dismissed under Fed. R. Civ. P. 12(b)(6).

DATED this 1st day of July, 2019.

HARRANG LONG GARY RUDNICK P.C.

By:    s/J. Aaron Landau
      J. Aaron Landau, OSB #094135
      Of Attorneys for Defendants

# CERTIFICATE OF SERVICE

I certify that on July 1, 2019, I served or caused to be served a true and complete copy of the foregoing **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST CLAIM FOR RELIEF** on the party or parties listed below as follows:

- ☑ Via CM / ECF Filing
- ☐ Via First Class Mail, Postage Prepaid
- ☐ Via Email
- ☐ Via Personal Delivery

James Buchal, OSB 921618
jbuchal@mbllp.com

Attorney for Plaintiffs

HARRANG LONG GARY RUDNICK P.C.

By:   s/J. Aaron Landau
    William F. Gary, OSB #770325
    J. Aaron Landau, OSB #094135
    Of Attorneys for Defendants
